[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 24, 2003
THOMAS K. KAHN
CLERK

No. 02-10277

D. C. Docket No. 01-08069 CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RICHARD ELLINGTON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(October 24, 2003)**

Before EDMONDSON, Chief Judge, DUBINA, Circuit Judge, and HODGES[*],
District Judge.

_____

[*]Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida,
sitting by designation.

PER CURIAM:

The United States of America appeals the district court's order granting Richard Ellington's motion for a judgment of acquittal. The district court granted the motion after a jury found Ellington guilty of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371, and of mail fraud, in violation of 18 U.S.C. § 1341. We vacate the judgment of acquittal.

BACKGROUND

The Palm Beach County Housing Finance Authority ("HFA") is a governmental entity chartered under Florida law to fund low-cost housing. Lloyd Hasner was the chairman of the HFA, the proprietor of Hasner Realty, and an officer in Castle Florida Building Corporation: a construction company owned by his brothers. Ellington, who is a lawyer, served as the paid legal adviser to the HFA.

At the September 1996 HFA meeting, Hasner proposed that Lisa Fisher be hired as a consultant. Fisher was a sales associate with Main Street Realty and owned Lisa Fisher & Company: a real estate consulting firm. The HFA approved the motion to negotiate a contract with Fisher, and Ellington was directed to

2

prepare a contract. This agreement was presented to the HFA at its October 1996 meeting. The agreement provided for a six-month contract with Fisher at $5,000 per month and for reimbursement of Fisher's expenses. Due to concerns about the amount of expenses to be paid, final action on the contract was deferred.

In the meantime, Fisher was retained by Hawthorne Ltd., a developer of low-income housing projects, to find potential sites in Florida. Fisher contacted Hasner about the availability of potential project sites. In November 1996, Hasner contacted Chris Fleming at Reichel Realty about a 30-acre tract of land in Greenacres City, Florida. This 30-acre parcel of land would later be named Chelsea Commons. Hasner registered Fisher as the agent for a potential buyer.[1] At Hasner's direction, Fisher contacted Fleming to confirm that she was acting on behalf of Hawthorne.

Fleming and Fisher reached an oral understanding for the sale of the 30-acre tract to Hawthorne for $1.8 million. On 14 November 1996, Fleming sent Fisher a letter confirming their agreement on the distribution of the 6% brokers's commission. Under this agreement, Reichel Realty and Main Street Realty, respectively, were to receive 3-1/2% and 2-1/2 % of the commission. It was also

---

[1] A broker representing a buyer registers his client with the listing agent to preserve his interest in the commission.

then agreed that Reichel Realty and Lisa Fisher & Company would each pay Hasner a referral fee of $4,500, for a total of $9,000. Main Street Realty did not receive the 14 November letter setting the agreement on Hasner's referral fee, that is that Fisher and Reichel Realty had agreed to pay Hasner a $9,000 referral fee. In addition to the $9,000 Hasner was to receive from Reichel Realty and Lisa Fisher & Company, Main Street Realty agreed to pay Hasner a separate referral fee of 1% of the purchase price, or $18,000.

At the 18 November 1996 HFA meeting, it was announced that Hawthorne had secured a potential development site and wished to enter a proposal for the development of a publicly-funded affordable housing development. That Fisher had been retained by Hawthorne and would receive a $30,000 contingency fee from Hawthorne upon HFA's final approval of the project was disclosed.

At the 18 November meeting, the HFA also discussed the issue of Fisher's still-pending consulting contract. An HFA member expressed concern over Fisher's simultaneous employment by Hawthorne and HFA. As a result, a provision was added to Fisher's contract with the HFA which required Fisher to disclose any clients appearing before or submitting materials to the HFA. The HFA, including Hasner, unanimously approved Fisher's consulting contract with the HFA. Neither Fisher nor Hasner disclosed that, if the Chelsea Commons sale

4

was completed, Hasner would receive a referral fee. Thereafter, beginning in January 1997 and continuing through June 1997, Fisher received by mail her monthly retainer and expense reimbursements from the HFA.

On 16 December 1996, Hawthorne presented its proposal for Chelsea Commons and sought to have the project financed by HFA's issuance of about $16 million in tax-exempt bonds.[2] At this meeting, Hasner announced that he had a "potential conflict" and declined to vote on the matter. Hasner also executed the prescribed form stating that he had a potential conflict and was abstaining from discussing or voting on the matter. Hasner did not disclose the nature of his conflict to the HFA. The HFA voted to proceed with the development.

In January 1997, Castle Florida, the construction company owned by Hasner's brothers, negotiated a contract with Hawthorne to consult on the Chelsea Commons project. Ellington made an inquiry to the Florida Attorney General and the Florida Ethics Commission about the obligations of an HFA member who obtains a contract for services to be furnished in conjunction with a qualifying housing development. After Ellington was informed that the possession of such an interest violated Fla. Stat. § 159.606, Hasner submitted a letter stating that he

---

[2] About $13 million in bonds were ultimately issued.

had resigned as an officer of Castle Florida on 10 February 1997 and that Castle Florida's contract with Hawthorne had terminated.

At the 2 June 1997 HFA meeting, before the final vote on the Chelsea Commons project, an HFA member asked to be advised on conflicts of interests involved in the project. Ellington informed the HFA, in the presence of Hasner and Fisher, that Hasner at one point thought that he might be the contractor for Chelsea Commons, but that event was not going to happen. Ellington stated, however, that Hasner would continue to desist from participating in the debate or voting on the Chelsea Commons issue. Ellington also noted that Fisher had disclosed from the beginning that she was the agent for the project. Ellington then stated "[o]ther than that, I don't know of any other disclosures that need to be made." Neither Ellington, Hasner, or Fisher, informed the HFA that Hasner was to receive a $27,000 brokerage fee from the Chelsea Commons project.

The Chelsea Commons project involved the separate closings of the real estate and bond transactions. The real estate sale closed first. The initial draft of the closing statement ("HUD-1"), prepared by the buyer's attorney Gary Johnson, omitted all reference to Hasner's fees. Later, upon receiving notice reflecting that Hasner was to receive a $9,000 fee, Johnson revised the HUD-1 to reflect the $9,000 payment to Hasner. The buyer seemingly was never notified that Hasner

was to receive other sums as well, including $18,000 from Main Street. So, the HUD-1 did not reflect the additional $18,000 fee Hasner was to receive from Main Street Realty.

Upon Ellington's receiving the revised HUD-1, Ellington pointed out the listing of a $9,000 fee to the other attorneys for the bond closing. HFA's bond counsel, Stephen Sanford, and the developer's attorney, Randy Alligood, concluded that Hasner's receipt of payment was improper. As a condition of the bond issuance, the attorneys were required to warrant that the matter being financed had been conducted in accordance with Florida law, including the conflict of interest provisions of Fla. Stat. § 159.606.[3] Alligood and Sanford informed Ellington that they would withhold their approving opinions if Hasner's payment was not repudiated.

Alligood prepared a letter for Hasner's signature, in which the real estate fee was disclaimed and its inclusion in the closing statement deemed a mistake.

---

[3] Florida Statute section 159.606 provides in relevant part:
"No member or employee of a housing finance authority shall acquire any interest, direct or indirect, in any qualifying housing development or in any property included or planned to be included in such a development, nor shall a member or employee have any interest, direct or indirect, in any contract or proposed contract for materials or services to be furnished or used in connection with any qualifying housing development. If any member or employee of a housing finance authority owns or controls an interest, direct or indirect, in any property included or planned to be included in any qualifying housing project, the member or employee shall immediately disclose the same in writing to the housing finance authority."

7

Ellington spoke with Hasner and informed him that "to fix the situation" Hasner should sign the letter disclaiming the interest in the $9,000 real estate fee and that Fisher would pay the fee to Hasner out of an unrelated project called Tierra Vista. Ellington stated that it had to be "very understood" between Ellington, Hasner, and Fisher, that "nobody else [was] to know" about Ellington's proposed solution.

Hasner then contacted Fisher to obtain her assurance that he would be paid his commission even if he renounced his fees. Fisher attempted to assure Hasner that the owner of Main Street Realty, Judy Black, would not learn of the disavowal letter. Hasner later informed Ellington that he would allow the entire housing project to "crater" if he did not receive a written commitment from Main Street Realty that he would receive his full fee. Fisher called Steve Chitwood, the senior broker involved in Main Street Realty's commercial real estate sales. According to Fisher, Chitwood, after some debate, gave his permission for Hasner to be paid from the Tierra Vista project.[4] Nothing in the documents possessed by Main Street Realty reflected that Hasner was to receive a commission from the Tierra Vista project. According to Black it would have been Chitwood's responsibility to

---

[4] The wiretap evidence does reflect that, while Ellington and Hasner, by telephone, were discussing possible ways Hasner could disavow his commission and still receive his fee, Fisher can be heard in the background speaking on a nearby telephone. Ellington then informed Hasner that, according to Fisher, Main Street had agreed to pay Hasner out of the Tierra Vista project. Nothing reflects, however, what Fisher told Chitwood. In the light of the other evidence, the jury could conclude that Fisher did not tell Chitwood that Hasner had disavowed his commission.

note the changes in the file.  Black agreed, however, that because the change was not in the file did not necessarily mean that Chitwood had not agreed to it.

After being informed by Ellington that Main Street Realty had agreed to pay his commission fee, Hasner asked Ellington if Main Street Realty would send Hasner a confirming letter.  Ellington responded that he would prefer not to have a letter to that effect because it was a "paper trail."  Nonetheless, Ellington told Hasner that they would try to get something in writing.  Fisher provided Hasner with a handwritten letter signed by Fisher as an associate of Main Street Realty, a letter stating that Hasner Realty had earned a real estate commission from the Tierra Vista project.  Hasner signed the disavowal letter; and after receiving Hasner's disavowal letter, the bond attorneys issued their opinion letters.  No evidence shows that Fisher or anyone else provided Main Street Realty with a copy of the disavowal letter or of her handwritten assurance to Hasner that he would be paid his commission on the Tierra Vista project.

The pending sales transaction forms -- used by Main Street Realty to track the money received and expended by the company in real estate transactions -- did not reflect that Hasner was to receive a commission for the Tierra Vista property.  Forms did reflect, however, that Hasner was to receive a $22,500 referral fee for the Chelsea Commons property.  As a result, Black wrote Hasner a check for

9

$22,500 from the Chelsea Commons project. Upon Hasner's request, the check was sent to him by Federal Express. Later, after Black learned of the disavowal letter, she sought the return of Hasner's commission.[5]

When interviewed by FBI Special Agent Jeffrey Danik on 3 March 2000, Ellington said that he had first learned of Hasner's real estate commissions at the bond closing and that he had determined that Hasner could not accept such a payment. Ellington told the FBI agents that Hasner had willingly relinquished his claim and that Ellington had played no role in inducing Hasner to sign the disavowal letter.

On 8 May 2001, a grand jury returned an indictment against Hasner, Fisher, and Ellington. Count One charged defendants with conspiring to deprive the Palm Beach County Housing Finance Authority ("HFA") of Hasner's honest services and to acquire money and property through fraudulent misrepresentations, in violation of 18 U.S.C. § 371. The indictment specifically charged that defendants defrauded Main Street Realty of money by concealing that Hasner had signed a document disclaiming his commission in connection with the Chelsea Commons transaction.

---

[5] Upon learning of Hasner's conflict, Reichel Realty had refused to pay Hasner the $4,500 referral fee. This $22,500 sum represented the $18,000 referral fee from Main Street Realty plus $4,500 that had also been promised by Fisher.

Count Two charged the defendants with mail fraud for Hasner's receipt of the check from the Chelsea Commons project, sent via Federal Express, in violation of 18 U.S.C. § 1341.[6]

The district court submitted a special verdict form to the jury which allowed the jury to convict on Counts One and Two based upon (1) the acquisition by the defendants of Main Street Realty's money by means of false pretenses; and (2) the deprivation of the HFA's right to Hasner's honest services. The verdict form required the jury to indicate specifically which objectives, if either, the defendant had conspired to achieve. The jury returned the special verdict form concluding that Ellington had conspired to deprive Main Street Realty of its money and property by means of false pretenses. The jury also convicted Ellington of the substantive count of mail fraud on Main Street Realty.

The district court determined that, upon examining all the evidence in a light most favorable to the verdict, insufficient evidence supported Ellington's convictions. The district court stated that, because Main Street Realty had ultimately benefitted economically from the Chelsea Commons transaction, Main Street Realty could not have been defrauded of its money and property under the mail fraud statute. The district court further noted that Hasner and Fisher's

---

[6] Ellington was not named in the remaining counts.

11

discussions about whether to disclose the disavowal letter to Main Street Realty were insufficient to support a conviction for conspiracy to defraud. The district court therefore granted Ellington's judgment of acquittal. The government appeals.

## DISCUSSION

The government argues that the district court erred by granting Ellington a judgment of acquittal. The government contends that the district court failed to acknowledge the substantial array of evidence demonstrating Main Street Realty's victimization. The government further asserts that the district court failed to articulate fully the rationale for its decision and that the order of dismissal is subject to two interpretations: (1) that Main Street Realty could not have been defrauded because it was in Main Street Realty's ultimate economic interest for the Chelsea Commons deal to be completed; or (2) that Main Street Realty was, in substance, an unindicted co-conspirator. The government asserts that under either interpretation the entry of a judgment of acquittal was inappropriate.

Ellington responds that the district court properly determined that no reasonable juror could have concluded that the evidence was sufficient to convict

on the money and property element of the indictment. Ellington argues that the evidence reflects that Main Street Realty had agreed to pay Hasner the $22,500 commission and that Main Street Realty was not deprived of its money or property by fraud.

In reviewing the district court's grant of a judgment of acquittal, our evaluation is comparable to the standard used in reviewing the sufficiency of the evidence to sustain a conviction. United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999). In assessing the propriety of the district court's decision, we must determine whether based on the evidence presented in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id.

For a defendant to be convicted of a conspiracy to defraud under 18 U.S.C. § 371, the government must demonstrate, beyond a reasonable doubt, "(1) an agreement among two or more persons to achieve an unlawful objective; (2) knowing and voluntary participation in the agreement; and (3) an overt act by a conspirator in furtherance of the agreement." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). "Because secrecy is an essential element of conspiracy, such an agreement may be proved by circumstantial as well as direct

13

evidence." United States v. Hernandez, 921 F.2d 1569, 1575 (11th Cir. 1991) (quotation omitted).

To prove mail fraud, the government must show that the accused "(1) intentionally participated in a scheme or artifice to defraud and (2) used the United States mails to carry out that scheme or artifice." See United States v. Waymer, 55 F.3d 564, 568 (11th Cir. 1995).

Sufficient evidence supports Ellington's convictions.[7] The wiretap evidence reflects that, after Hasner Realty showed up on the real estate closing statement as receiving a $9,000 commission, Ellington told Hasner that he had a proposal to "fix the situation." Ellington stated, however, that it had to be "very understood" between Ellington, Hasner, and Fisher that nobody else was to know about the agreement to execute the disavowal letter and then to pay Hasner's fee out of the

---

[7] As an initial matter, we disagree with the district court's statement that Main Street Realty could not have been defrauded because the Chelsea Commons transaction ultimately inured to Main Street Realty's economic benefit. Although arguably true that Main Street Realty would have received no commission for Chelsea Commons if the whole housing project deal fell through, once Hasner disavowed the $22,500 commission, Main Street Realty was entitled to keep $22,500 more. See United States v. Ashman, 979 F.2d 469, 478-79 (7th Cir. 1992)(stating that scheme to divert profits from customers may be actionable even if customers nonetheless benefit from the transactions); United States v. Dandy, 998 F.2d 1344, 1358 (6th Cir. 1993)(upholding mail fraud conviction because, although defendant did not commit mail fraud simply by profiting from breach of fiduciary duty to victim, evidence showed that victim had to pay higher prices for goods received under contract because provider of goods was paying kickbacks to defendant). If Main Street Realty was deceived -- by Hasner's alleged disavowal being hidden from it -- then it was deprived by fraud of the $22,500 in commissions.

Tierra Vista project. These circumstances sound like a conspiracy with this objective: to get money from Main Street Realty that the company did not owe.[8] Put differently, a jury could reasonably infer from this statement that Ellington did not intend for Main Street Realty to be informed of the disavowal letter, which would have placed Main Street Realty on notice that it was no longer obligated to pay Hasner the commission. Furthermore, a jury could reasonably conclude that the failure to provide Main Street Realty with a copy of Hasner's disavowal letter or of Fisher's letter indicating that Main Street Realty owed Hasner a real estate commission from the Tierra Vista project were acts in furtherance of the conspiracy. This evidence was sufficient for a jury to convict Ellington of conspiring to defraud Main Street Realty.

Based upon the evidence before it, the jury could also reasonably conclude that Ellington and his co-conspirators did not inform Main Street Realty of Hasner's disavowal letter, thereby completing the substantive offense of mail fraud once Hasner's check was sent by Federal Express.

Ellington does not contend that he advised Main Street Realty himself of the disavowal letter. Although Fisher testified that she informed Chitwood (the

---

[8] No one claims that Fisher's knowledge of Hasner's disavowal letter was sufficient to place Main Street Realty on notice that it was no longer obligated to pay Hasner's fee.

pertinent Main Street Realty contact) that Hasner had to waive his commission on the Chelsea Commons project, the jury was free to reject this testimony.[9] See United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (stating that credibility determinations are the sole province of the jury). Indeed, based upon other evidence in the record, a jury could reasonably conclude that Main Street Realty was not informed of Hasner's disavowal letter. The record reflects that Main Street Realty's records, in Chitwood's handwriting, were amended to reflect a change in the amount of the commission that Hasner was to receive; but the records continuously reflected that Hasner was to be paid from the Chelsea Commons transaction. The record also reflects that Fisher did not provide Main Street Realty with a copy of Hasner's disavowal letter or of her handwritten letter to Hasner assuring him that Main Street Realty would pay his commission from the Tierra Vista project. The evidence was sufficient for a jury to conclude reasonably that Ellington and his co-conspirators did not inform Main Street

---

[9] We recognize that Chitwood, the best person to speak to this issue, did not testify at trial. Ellington, in support of his motion for judgment of acquittal, filed an affidavit from Chitwood, in which Chitwood avers that, although he initially informed the government that he had not authorized the commission payment through Tierra Vista, he later corrected that statement after he had a chance to refresh his recollection. Ellington admits in his motion for judgment of acquittal that the defense was aware before trial that Chitwood stated he had authorized the payment of Hasner's commission from the Tierra Vista project. Furthermore, Chitwood's affidavit is silent about whether Fisher informed him about the disavowal letter.

16

Realty about Hasner's disavowal letter and, thus, caused Main Street Realty to pay money it did not owe.

A jury could reasonably conclude that Ellington and his co-defendants intended Main Street Realty not to be informed that, under Hasner's disavowal letter, it was no longer obligated to pay Hasner's fee, that Main Street Realty was, in fact, not informed of the disavowal letter, and thus that Main Street Realty was defrauded into paying -- by Federal Express -- Hasner's fee.

## CONCLUSION

Because the government presented sufficient evidence from which a reasonable jury could conclude beyond a reasonable doubt that Ellington was guilty of conspiracy to commit mail fraud and mail fraud, we VACATE the district court's judgment of acquittal and REMAND with instructions that the district court reinstate the jury's verdict and for further proceedings.

VACATED AND REMANDED.