[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16984

_____

D.C. Docket No. 1:15-cr-00072-JRH-BKE-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CATHEDRAL HENDERSON,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 27, 2018)

Before ROSENBAUM, JILL PRYOR and RIPPLE,* Circuit Judges.

RIPPLE, Circuit Judge:

_____

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

After a federal investigation into recordkeeping practices at a Department of Veterans Affairs ("VA") hospital, Cathedral Henderson was charged with fifty counts of making false statements in connection with the delivery of, or payment for, healthcare services, in violation of 18 U.S.C. § 1035; and with one count of knowingly and willfully making a materially false statement to a federal agent, in violation of 18 U.S.C. § 1001.  A jury convicted Mr. Henderson on all counts, and the district court sentenced him to twenty-seven months' imprisonment for each of the fifty-one counts, to be served concurrently.  The district court also denied Mr. Henderson's motions for judgment of acquittal and for a sentence reduction. Mr. Henderson now challenges the sufficiency of the evidence supporting his convictions and separately challenges his sentence.  Because his convictions are supported by legally sufficient evidence and because the district court did not err in applying the Sentencing Guidelines, we affirm his convictions and his sentence.

# I

## BACKGROUND

### A.

At all relevant times, Mr. Henderson was the Chief of the Fee Division at Charlie Norwood VA Medical Center, which is a VA hospital in Augusta, Georgia. For various reasons, a VA patient sometimes needs healthcare that the VA cannot

provide through its own facilities.  When a VA healthcare provider determines that a patient needs treatment outside of the VA system, that provider enters a "consult" in the Computerized Patient Record System ("CPRS").  CPRS forwards all consults to the Fee Division, which reviews the consults to verify that they are appropriate for outside care and that the VA will pay the non-VA healthcare provider for the services.  After providing an "authorization for care," an employee in the Fee Division schedules the patient's appointment with the non-VA provider.[1]

The Fee Division also is responsible for paying the non-VA provider after the outside services are performed.  Before paying for the services, an employee in the Fee Division must verify that the VA patient *actually* received the scheduled services.  A Fee Division employee can verify that the services were performed by reviewing the patient's medical records for evidence of the services (such as test results, physician reports, or a signed consent form) or by speaking personally to the patient.  The Fee Division employee "completes" the consult by paying the outside provider's bill and by adding an explanatory note to the patient's file in CPRS (such as the date that the outside services were rendered).  Marking a consult as complete in CPRS triggers a notification to the VA provider who

---

[1] R.109 at 206 (Trial Tr.) (testimony of Maribeth Bredehoft-Veidt).

3

originally ordered the consult, allowing that provider to review the results and to make further decisions about patient care.

In 2012, it became clear that the consult system had not been operating as it should; there were 2.1 million open consults in CPRS. This backlog made it difficult for VA physicians to know the status of a consult and to determine how they should proceed with patient care. The VA therefore instructed its facilities to engage in a CPRS clean-up project to resolve as many of the open consults as possible. The clean-up project proceeded in multiple steps. First, the VA automatically closed all consults that had been open for five or more years and deleted all duplicate consults. Then, for consults that had been open between ninety days and five years, the VA engaged in a more thorough review process. First, it examined each record. For patients who had died or had missed several appointments, the VA discontinued the consults. For all others, the VA directed all facilities to review the patient records to determine whether the patient had received the consult services.

VA examiners employed several techniques to determine whether a patient had received the consult services. For instance, an examiner might find in the patient's medical records a progress report from the outside healthcare provider. VA employees working on the clean-up project also could call a patient to determine whether the patient had received the outside services. Once the VA had

4

verified that the patient had received the services, the examiner closed the consult in CPRS with an explanatory comment. If the VA could not verify completion of the services, the examiner would send the consult to the VA provider who initially ordered the consult for further follow-up.

Charlie Norwood VA Medical Center had 30,000 open consults to address in the mandated consult clean-up process. Maribeth Bredehoft, its Chief of Health Administration Services, supervised the process. She instructed employees at all levels of the VA to participate, including non-clinical personnel (such as billers or schedulers). Bredehoft prepared detailed training and instructions for employees working on the clean-up project. Specifically, she instructed all employees on the project to examine each patient's medical records for documentary evidence that the services had been provided and to close each consult that had such documentation with an explanatory comment in CPRS. If the employee could not find such documentation or if it was not clear from the file whether the service had been provided, Bredehoft instructed that the employee should leave the consult open for further review.

Eventually, Bredehoft instructed Mr. Henderson to supervise his own subordinates in the clean-up project. Bredehoft did not include Mr. Henderson in the detailed training process that she provided for other employees participating in the clean-up. The Government presented evidence that, as Chief of the Fee

5

Division, Mr. Henderson was familiar with the routine consult completion process and had supervised regularly Fee Division employees in the closing of consults after the outside bills were paid.

Bredehoft emailed Mr. Henderson and instructed him that there were "thousands of consults" in CPRS that "need action."[2] She said that the consults "from the very beginning … [were] to be completed when the claim was processed and doc[umentation] received and that was not done."[3] Mr. Henderson responded that consults were "clinical" and that he did not believe his staff should be responsible for closing them.[4] Bredehoft responded that the consults were "past consults … that were to be closed when the claim was processed for payment. That meant that the services were rendered, documentation along with claim received, bill processed … that is the bottom line."[5] Despite his protests to Bredehoft, Mr. Henderson eventually acquiesced in her request that he join the clean-up process.

As Chief of the Fee Division, Mr. Henderson oversaw two groups of employees: Fee Clerks and Revenue Clerks. Fee Clerks regularly closed consults as part of their job duties and were involved in the process of paying the bills from

---

[2] R.136 at 10.

[3] *Id.*

[4] *Id.* at 8.

[5] *Id.*

outside service providers.  Revenue Clerks had different responsibilities related to the VA's provision of medical services to employees of other federal agencies. Specifically, the Revenue Division managed the process of billing those federal agencies for that medical care.  The Revenue employees therefore had no experience with the VA consult process because they did not close consults as part of their regular job duties and, prior to working on the clean-up project, had no access to CPRS.  Mr. Henderson nevertheless delegated the consult clean-up project to four Revenue employees.

Mr. Henderson directed the Revenue employees to close consults opened from October 1, 2012, through September 30, 2013.  He instructed them to close all of those consults with a comment in CPRS along the lines of "[s]ervices rendered or patient refused services."[6]  He did not instruct them to examine each patient's medical records for evidence that the patient actually had received the services, an important step in the consult-closing process.  Following Mr. Henderson's instructions, the Revenue employees closed 2,725 open consults with the comment "services rendered or patient refused services."

During the clean-up process, Bredehoft performed random checks of the closed consults to ensure that the closed consults indeed were accompanied by

---

[6] R.109 at 188 (Trial Tr.) (testimony of Denise Gray).

appropriate documentary evidence.  During one of these checks, she discovered some of the consults closed by the Revenue employees.  She confronted Mr. Henderson, because she suspected that the employees were closing consults without following the appropriate procedure to verify that the services had been rendered.  She informed Mr. Henderson that the comments on the closed consults were incorrect and ordered him to fix them.  Mr. Henderson did not follow this directive and did not instruct the Revenue employees to correct the improperly closed consults.

The Government does not dispute that Mr. Henderson did not receive the full training that Bredehoft provided to other employees involved in the clean-up mandate.  It emphasizes that, as Chief of the Fee Division, "Henderson was an expert in the responsibilities of the Fee Division and knew its regulations" and "knew the proper way to confirm that the patient had received the services before closing a consult."[7]  However, the Revenue employees also did not receive Bredehoft's special training; they were limited to the instructions given to them by Mr. Henderson.

At some point, the Office of the Inspector General received an anonymous tip that consults were being closed improperly at Charlie Norwood and sent

---

[7] Government's Br. 12.

8

Tracy Brumfield to investigate. Investigator Brumfield conducted some interviews but, due to the limited nature of the anonymous tip, was unable to uncover any wrongdoing in his initial investigation. Later, however, the Office of the Inspector General received a more detailed report from a VA employee. Specifically, the employee alerted the Inspector General that there were "four employees" who "were not familiar with the process of completing consults."[8] The employee also reported that she was concerned with the "verbiage" the group had used to close consults: "[s]ervices have been completed or patients refused services."[9]

Investigator Brumfield conducted several more interviews. Notably, he interviewed the Revenue employees involved in the clean-up mandate.[10] During one of these interviews, he learned that one of the Revenue employees had written down Mr. Henderson's exact instructions at the time he had given them. Those instructions included a directive to include the comment "services have been completed or patient refused service" on each of the closed consults.[11]

---

[8] R.109 at 459 (Trial Tr.) (testimony of Tracy Brumfield).

[9] *Id.*

[10] Investigator Brumfield testified that he interviewed only three of the four Revenue employees, as one had passed away before his investigation.

[11] R.135 at 28.

9

After Investigator Brumfield had conducted about thirty interviews, he interviewed Mr. Henderson. They had a discussion about what instructions Mr. Henderson had given the Revenue employees.

> SPECIAL AGENT BRUMFIELD: So as I understand what you've just said is that they went into the system and they did not contact any of the patients, however it was noted.
>
> Now, the directions that you specifically gave them, do you recall what those directions were?
>
> MR. HENDERSON: To administratively close the consult by Chief of H.A.S. That's the statement. That's all.
>
> SPECIAL AGENT BRUMFIELD: Was there any other comments that they were to put into the system?
>
> MR. HENDERSON: Not that I remember, no.[12]

Later, Investigator Brumfield confronted Mr. Henderson with the instructions one of the Revenue employees had written down and given to Investigator Brumfield, which matched the statement the Revenue employees had entered on the closed consults. Mr. Henderson confirmed that the directions "sound[ed] familiar to what [he] shared with them [for] how to process" the consults.[13] Mr. Henderson's explanation for giving the instructions that he did was that the Revenue employees "shouldn't have been [handling consults] in the first

---

[12] *Id.* at 25–26.

[13] *Id.* at 28.

10

place," that they "wouldn't know how to find" documentary evidence in CPRS that the consult had been completed, and that he did not want to "explain to them something clinically that they would never be able to find."[14]

### B.

A grand jury indicted Mr. Henderson on fifty counts of making false statements in connection with the delivery of or payment for healthcare services, in violation of 18 U.S.C. § 1035, based on the statement entered on each of the closed consults. It also indicted him on one count of making a false statement to a federal agent, in violation of 18 U.S.C. § 1001, based on his statement to Investigator Brumfield. After the Government presented its evidence at trial, Mr. Henderson moved for a judgment of acquittal on all counts, which the district court denied. A jury convicted Mr. Henderson on all counts. After the conviction, Mr. Henderson filed a written renewed motion for judgment of acquittal or, in the alternative, for a new trial. The district court denied that motion.

At sentencing, the Government asked the district court to apply U.S.S.G. § 2B1.1(b)(15)(A), for a theft offense involving "the conscious or reckless risk of death or serious bodily injury." Mr. Henderson's probation officer had not included this guideline in Mr. Henderson's sentencing recommendation.

---

[14] *Id.* at 34.

Mr. Henderson objected to the application of § 2B1.1(b)(15)(A), contending that he did not consciously or recklessly disregard any risk. The district court noted that Mr. Henderson had expressed concern to Bredehoft about the consult clean-up project, specifically "about the lack of his medical training and that of his employees who were being tasked with the job of reviewing and closing the old consultations."[15] Mr. Henderson also "initially refused to comply with the orders to close" the consults.[16] The fact that Mr. Henderson carried out Bredehoft's commands anyway led the district court to conclude that Mr. Henderson was "aware of the risk and that notwithstanding that risk, he disregarded it and gave the instructions to his employees to summarily close the consultations."[17] The district court calculated the guidelines range as twenty-seven to thirty-three months' imprisonment and ultimately sentenced Mr. Henderson to twenty-seven months for each of the fifty-one counts, all to be served concurrently.

The district court entered the judgment of conviction on October 21, 2016.[18] On November 2, 2016, Mr. Henderson filed a motion under Federal Rule of Criminal Procedure 35 to reduce his sentence.[19] On November 4, 2016,

---

[15] R.134 at 23 (Sentencing Tr.).

[16] *Id.*

[17] *Id.* at 24.

[18] R.120.

[19] R.121.

Mr. Henderson timely filed a notice of appeal specifically as to the district court's October 21 judgment.[20]  The district court denied Mr. Henderson's motion to reduce his sentence on November 14, 2016.  Mr. Henderson did not appeal separately the November 14 denial or amend his original notice of appeal to incorporate the district court's November 14 denial.

## II

## DISCUSSION

Mr. Henderson now challenges the sufficiency of the evidence supporting each of his convictions.  He also contends that the district court improperly applied U.S.S.G. § 2B1.1(b)(15)(A) to increase his offense level to fourteen.  For the reasons stated below, we cannot accept Mr. Henderson's arguments and accordingly affirm the judgment of the district court.

## A.

Mr. Henderson was convicted of fifty counts of violating 18 U.S.C. § 1035, which prohibits the making of any "materially false, fictitious, or fraudulent statements or representations … in connection with the delivery of or payment for health care benefits, items, or services."[21]  He now contends that the Government

---

[20] R.122.

[21] The full statute reads:

(continued … )

failed to prove that the false statements entered into CPRS were material and that he had the requisite criminal intent.

### 1. Materiality

In his motion for judgment of acquittal, Mr. Henderson raised challenges only as to his criminal intent. Therefore, our review of Mr. Henderson's challenges to the sufficiency of the evidence regarding the materiality of the false entries in CPRS is limited to review for plain error. *See United States v. Joseph*, 709 F.3d 1082, 1093 (11th Cir. 2013) ("We review unpreserved objections for plain error, including unpreserved objections to … the sufficiency of the evidence." (citations omitted)).[22]

---

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully——
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
> >
> > (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1035.

[22] The Government contends that the parties had agreed that mens rea was the only disputed element at trial. The parties did not formally enter into a stipulation that the materiality of the statements was not in dispute. Because we find that Mr. Henderson failed to preserve his arguments on materiality by not including them in his motion for judgment of acquittal, we need not decide whether, in the absence of a formal stipulation, Mr. Henderson can be said to have "agreed" that materiality was not in dispute.

To prevail under the plain error standard, Mr. Henderson must show "(1) error, (2) that is plain, and (3) that has affected the defendant's substantial rights." *United States v. Hesser*, 800 F.3d 1310, 1324 (11th Cir. 2015) (quoting *United States v. Khan*, 794 F.3d 1288, 1300 (11th Cir. 2015)). Moreover, even if we determine that Mr. Henderson has satisfied these threshold criteria, we only "may exercise our discretion to recognize" the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) (per curiam)).

A false statement is material if it "'has a natural tendency to influence, or [is] capable of influencing, the decision of" the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988); *see also United States v. Clay*, 832 F.3d 1259, 1309 (11th Cir. 2016).[23] The Government does not need to show that the decisionmaker actually relied on the false statement. *Clay*, 832 F.3d at 1309. Moreover, a false statement can be material even "if the

---

[23] The discussions of materiality in *Kungys v. United States*, 485 U.S. 759 (1988), and *United States v. Clay*, 832 F.3d 1259 (11th Cir. 2016), related to criminal false statements under different statutes. As the Supreme Court has noted, though, "material" has a longstanding and commonly understood meaning "in the context of false statements." *Kungys*, 485 U.S. at 769. We see no reason not to apply a consistent definition across statutes criminalizing material false statements. *See United States v. Natale*, 719 F.3d 719, 737 n.9 (7th Cir. 2013) (applying *Kungys* definition of "material" to materiality analysis under 18 U.S.C. § 1035).

decision maker actually knew or should have known that the statement was false." *Id.* (quoting *United States v. Neder*, 197 F.3d 1122, 1128 (11th Cir. 1999)).

Mr. Henderson contends that the Government failed to prove the materiality of the false statements entered into CPRS because, at best, the ambiguous statements would have confused medical professionals and would not have influenced their substantive decisionmaking.[24] At trial, however, the Government presented evidence that the false statement could have misled a medical professional into thinking that the services actually had been rendered.[25]

The Government also presented witnesses who testified that the comment entered into CPRS (that services were rendered or the patient had refused services)

---

[24] Section 1035 applies only to statements made "in any matter involving a health care benefit program" and "in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1035. We recognize that one of our sister circuits has held that § 1035 applies only to statements that are material *to the health care benefit program*, as opposed to being material to future health care decisions made by *health care providers*. *Natale*, 719 F.3d 719. Mr. Henderson has not relied on the Seventh Circuit's holding in *Natale*, nor has he demonstrated that the Government's evidence did not satisfy the *Natale* standard. We therefore decline to comment on whether we would apply the *Natale* standard in our circuit to convictions under § 1035. Moreover, "[i]t is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003) (per curiam). Therefore, even if we were to adopt the *Natale* standard, it would not require reversal here, because there can be no plain error when the error is not "clearly established and obvious." *United States v. Hesser*, 800 F.3d 1310, 1325 (11th Cir. 2015).

[25] R.109 at 326 (Trial Tr.) (testimony of Victoria Coates). Coates testified that the language used to close the consults risked patient health because medical providers could read it and "believe that they understand what's going on, but that's not really true." *Id.*

16

was "internally inconsistent."[26]  Because a patient cannot both receive *and* refuse services, a medical provider would have had to take the time to figure out what actually had happened before proceeding with patient care.[27]  Mr. Henderson counters that the fact that a professional would have had to inquire further demonstrates that the statements were not material.  We cannot accept this view.  First, he ignores the fact that despite the ambiguity in the statements, a medical professional might have misunderstood the comment as indicating that the patient did actually receive services.  In any event, causing confusion through ambiguous statements endangered patient care, even if the only effect on the operations of the VA was to delay treatment while the medical professional sorted out the confusion.

Mr. Henderson also contends that the false statements used to close the consults cannot be material because all of the consults were from previous fiscal years and therefore could not have been used as authorization to retain and later compensate the outside healthcare provider.  It might be true that the outside bills could not have been paid without more up-to-date consults, but the Government presented testimony at trial that the older consults still were relevant to the operation of the VA healthcare system.  Investigator Brumfield testified that the

---

[26] *Id.* at 325; *see also id.* at 573 (testimony of Michael Davies).

[27] *Id.* at 573.  Davies testified that the language used to close the consults would have required him to follow up with the outside provider and the patient, either to get the consult results (if the services had been rendered) or to discuss the patient's refusal (if the patient had refused services).  *Id.*

fiscal year in which a consult was entered "did not matter" and that "the consult

matters" and stays "open until [the] veteran … properly receiv[es] the care."[28]

Another VA employee testified that a consult could be "ordered in one fiscal year,

but then completed in maybe one or two fiscal years afterwards."[29]  Moreover, the

VA focused its efforts on reviewing all consults that were between ninety days and

*five years* old, indicating that consults older than the current fiscal year were

important to the VA's operations.

Therefore, we see no error, let alone plain error, in the sufficiency of the

Government's evidence as to the materiality of the false statements in CPRS.

2. Mens Rea

Next, Mr. Henderson challenges his § 1035 convictions on the ground that

the Government did not prove the requisite criminal intent.  Because

Mr. Henderson properly preserved this argument in his motion for judgment of

acquittal, we review it under the usual standard.  We review de novo the district

court's denial of a motion for judgment of acquittal, but "our evaluation is

comparable to the standard used in reviewing the sufficiency of the evidence to

sustain a conviction."  *United States v. Bergman*, 852 F.3d 1046, 1060 (11th Cir.

2017) (quoting *United States v. Ellington*, 348 F.3d 984, 989 (11th Cir. 2003) (per

---

[28] *Id.* at 521 (testimony of Tracy Brumfield).

[29] *Id.* at 552 (testimony of Shayla Desir).

curiam)). "Under that standard, we review the evidence presented at trial in the light most favorable to the government, and we draw all reasonable factual inferences in favor of the jury's verdict." *Id.* "[W]e will not overturn a jury's verdict 'if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" *United States v. Crabtree*, 878 F.3d 1274, 1284 (11th Cir. 2018) (quoting *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015)).

Section 1035 requires that the defendant act "knowingly and willfully." "A defendant acts willfully when he acts with 'knowledge that his conduct was unlawful' and acts knowingly if he acts with 'knowledge of the facts that constitute the offense.'" *Clay*, 832 F.3d at 1301 (quoting *United States v. Dominguez*, 661 F.3d 1051, 1068 (11th Cir. 2011)). The Government is entitled to prove knowledge or intent through circumstantial evidence. *Id.* at 1309.

 First, Mr. Henderson submits that Bredehoft "gave him reassurances that the medical services had been rendered in all of the cases and that they should have been closed already."[30] If Mr. Henderson truly believed that each patient on the list had either refused or received services, he would not have been acting with knowledge that the language used to close the consults was false. At trial,

---

[30] Appellant's Br. 25.

19

however, the Government presented legally sufficient evidence to refute this claim.

For example, the Government placed in evidence a transcript of the conversation

between Investigator Brumfield and Mr. Henderson.  Investigator Brumfield asked

Mr. Henderson why he gave his employees the instructions he did; specifically,

why he instructed the Revenue employees to close the consults with the comment

that the services were complete or that the patient had refused services.[31]

Mr. Henderson responded that the Revenue employees "wouldn't know how to

find" the information necessary to complete the consults correctly, and he did not

want "to explain to them something clinically that they would never be able to

find, because they shouldn't have be [sic] doing it in the first place."[32]

Mr. Henderson also ignored Bredehoft's instruction to remedy the improperly

closed consults after she discovered the problem.  Finally, Mr. Henderson was

familiar with the usual consult-closing process, had closed numerous consults

properly before the clean-up project began, and was aware of how much time it

would take to review each consult. The jury was entitled to believe that, to the

extent that Mr. Henderson relied on Bredehoft's statements as evidence that the

thousands of consults warranted summary closure, such reliance was unreasonable.

---

[31] R.135 at 31–32.  Various witnesses described the comment with slightly different phrasing; the slight differences are not relevant to this appeal.  *See, e.g.*, text accompanying note 37.

[32] *Id.* at 34.

From this evidence, the jury was entitled to infer that Mr. Henderson gave the instructions not because he actually believed that the services were complete or that the patients had refused services, but because he wanted to close the consults quickly per Bredehoft's insistence.

Second, Mr. Henderson contends that the Government did not prove his criminal intent with sufficient evidence because he intentionally instructed the Revenue employees to close consults only from prior fiscal years, and he knew that the consults would have to be re-issued before the VA could pay the bills from outside providers.  The Government presented evidence, however, that Mr. Henderson knew the statements were false and important to the operation of the VA healthcare system.  First of all, the Government's evidence showed that the entire review process focused on consults that were between ninety days and five years old.  If consults older than the current fiscal year were irrelevant, there would have been no reason to instruct the employees to review consults as old as five years.  Second, the Government presented evidence that prior to the events of this case, Mr. Henderson personally and correctly had closed consults that had been ordered in prior fiscal years.[33]  The jury was entitled to infer from this evidence

---

[33] *E.g.*, R.109 at 550–52 (Trial Tr.) (testimony of Shayla Desir).

21

that Mr. Henderson knew that consults from previous fiscal years were still relevant to the VA's operations and, therefore, that the false language was material.

The Government presented sufficient evidence for a jury to find that Mr. Henderson acted willfully[34] and knowingly.  Therefore, the district court did not err in denying Mr. Henderson's motion for judgment of acquittal.

## B.

Mr. Henderson next challenges the sufficiency of the Government's evidence supporting his conviction under 18 U.S.C. § 1001(a)(2), which prohibits making false statements to federal investigators.[35]  This conviction arose out of an interview between Investigator Brumfield and Mr. Henderson during the federal

---

[34] Mr. Henderson does not challenge the sufficiency of the Government's evidence that he acted willfully, meaning with the knowledge that his conduct was unlawful.  The Government presented ample evidence from which the jury could infer that Mr. Henderson knew his conduct was unlawful.  For example, CPRS notified Mr. Henderson with several warnings about criminal liability for misuse of the system each time he logged on.

[35] The statute provides:

  (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

    (2) makes any materially false, fictitious, or fraudulent statement or representation; or

    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

  shall be fined under this title [or] imprisoned not more than 5 years … .

18 U.S.C. § 1001.

investigation into the consult clean-up process at Charlie Norwood.  When

Investigator Brumfield first asked Mr. Henderson what instructions he gave the

Revenue employees, Mr. Henderson responded that they "put in there … 'consult

administratively closed by Chief of H.A.S.,' or whatever—that's the statement

they used."[36]  He said he did not remember if there were "any other comments that

they were to put into the system."[37]  However, in the course of the investigation,

Investigator Brumfield had spoken with several of the Revenue employees, at least

one of whom had written down detailed instructions from Mr. Henderson.  These

detailed instructions included a statement that for "comments, you will type

'services have been completed or patient refused service.'"[38]  Later in the

interview, then, Investigator Brumfield confronted Mr. Henderson with the

instructions that Investigator Brumfield knew Mr. Henderson actually had given

his employees.  Mr. Henderson acknowledged that he had, in fact, given those

instructions.[39]

A conviction under § 1001(a)(2) requires the Government to prove "(1) that

a statement was made; (2) that it was false; (3) that it was material; (4) that it was

made with specific intent; and (5) that it was within the jurisdiction of an agency of

---

[36] R.135 at 24.

[37] *Id.* at 26.

[38] *Id.* at 28.

[39] *Id.*

the United States." *Clay*, 832 F.3d at 1305 (quoting *United States v. House*, 684 F.3d 1173, 1203 (11th Cir. 2012)).  Mr. Henderson challenges the sufficiency of the Government's evidence of his criminal intent and the materiality of his false statement to Investigator Brumfield.[40]

First, Mr. Henderson submits that he did not knowingly make a false statement because he told Investigator Brumfield that he did not remember any other statement.[41]  He also submits that his instruction to "administratively close the consult by Chief of H.A.S."[42] was an explanation he gave to his staff and not an instruction of what comment to enter.  The transcript does not bear out his claims.  In the first place, we agree that if Mr. Henderson actually had told Investigator Brumfield that he did not remember what comments he instructed his staff to use, Mr. Henderson would not have made a false statement in his interview with Investigator Brumfield.  But the record is clear that Mr. Henderson stated to Investigator Brumfield that he told the employees to "put in [CPRS]" that the

---

[40] As with his challenge to the sufficiency of the Government's evidence as to his criminal intent under § 1035, Mr. Henderson properly preserved this challenge in his motion for judgment of acquittal.  Therefore, we apply the usual standard of review.  Although we review the district court's denial of his motion for judgment of acquittal de novo, the district court did not err in denying Mr. Henderson's motion so long as "any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Crabtree*, 878 F.3d 1274, 1284 (11th Cir. 2018) (quoting *United States v. Wilson*, 788 F.3d 1298, 1308 (11th Cir. 2015)).

[41] *See* R.135 at 26.

[42] *Id.*

24

consults were "administratively closed by Chief of H.A.S."[43]  That is inconsistent with the notation actually used by the Revenue employees and with the evidence of the instructions Mr. Henderson actually gave.  The jury was entitled to find that Mr. Henderson knew that his statement about the consult instructions was false.

Next, Mr. Henderson submits that his false statement to Investigator Brumfield was not material because Investigator Brumfield already knew what instructions Mr. Henderson actually had given to the Revenue employees.  However, a conviction under § 1001 requires only that the false statement must have "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *Clay*, 832 F.3d at 1309 (quoting *United States v. Boffil-Rivera*, 607 F.3d 736, 741 (11th Cir. 2010)).  "[T]he test is not whether the agents were actually misled."  *Id.*  "Indeed, a false statement can be material even if the decision maker actually knew or should have known that the statement was false."  *Neder*, 197 F.3d at 1128.  Mr. Henderson's assertions about what instructions he gave certainly were material to the Government's investigation into the consult clean-up process at Charlie Norwood, regardless of whether Investigator Brumfield knew from the start that the statements were false.

---

[43] *Id.* at 24.

The Government presented sufficient evidence to convince a reasonable jury both that Mr. Henderson knew his statements to Investigator Brumfield were false and that the false statements were material under § 1001. Therefore, the district court did not err in denying Mr. Henderson's motion for judgment of acquittal.

## C.

Mr. Henderson's final challenge is to his sentence. His challenges all center on the application of U.S.S.G. § 2B1.1(b)(15)(A). That provision provides for an increase in offense level when a theft offense involves "the conscious or reckless risk of death or serious bodily injury." We have noted that the guideline "focuses on the defendant's disregard of risk, rather than on the result." *United States v. Moran*, 778 F.3d 942, 977 (11th Cir. 2015). The Government need not show actual injury to any particular victim.

We review de novo the district court's interpretation of § 2B1.1(b)(15)(A) and its application of § 2B1.1(b)(15)(A) to the facts. *Id.* at 959. A finding of risk of death or serious bodily injury under § 2B1.1(b)(15)(A) is a factual finding that we review for clear error. *See id.* at 959, 978.

Mr. Henderson made, at two different points in the proceedings, different arguments as to why this enhancement provision does not apply. At his sentencing, he objected to the application of § 2B1.1(b)(15)(A) because he is not a medical professional and because he was acting under protest, as evidenced by his

26

email chain with Bredehoft about his hesitation to work on the project.  Later, in a Federal Rule of Criminal Procedure 35 motion for sentence reduction, he argued that § 2B1.1(b)(15)(A) should not apply because the ambiguous language used to close the consults meant that in all cases, medical professionals would require follow-up clinical review, so there was no risk to patient health.

With respect to the arguments advanced at sentencing, Mr. Henderson has two difficulties.  First, he has not raised these specific arguments on appeal.  *See United States v. Massey*, 443 F.3d 814, 819 (11th Cir. 2006) (noting that specific objections to an enhancement might not be preserved on appeal by different objections to the same enhancement made below).  Second, no matter what standard of review we apply, his objections were without merit.  As the district court noted, Mr. Henderson's initial refusal to participate in the project because he thought the consults required clinical review, coupled with his eventual acquiescence, demonstrated both that he was aware of the risks posed by closing consults with inaccurate statements and that he consciously disregarded that risk.

With respect to the objection raised in the Rule 35 motion and now offered on appeal, there are also two problems.  First, under *United States v. Cartwright*, 413 F.3d 1295 (11th Cir. 2005), we lack jurisdiction to consider the district court's denial of Mr. Henderson's Rule 35 motion.  Mr. Henderson filed his notice of appeal before he filed his Rule 35 motion and did not amend the original notice of

27

appeal or file a new notice of appeal after the district court denied his Rule 35 motion. Therefore, as in *Cartwright*, we lack jurisdiction to consider an appeal of the Rule 35 order. *See Cartwright* at 1299–1300.

Second, even if we had appellate jurisdiction over this contention, his arguments on appeal lack merit under any standard of review. For the same reason that the misrepresentations were material, they also risked serious bodily injury or death. The Government presented myriad evidence that the false entries in CPRS could have delayed and influenced patient care. Even a delay in order to follow up on the ambiguous consult language could have caused death or serious bodily injury. The Government did not need to show actual evidence of death or serious bodily injury; the enhancement "focuses on the defendant's disregard of risk, rather than on the result." *Moran*, 778 F.3d at 977. The district court did not clearly err in finding that Mr. Henderson's actions created a risk of death or serious bodily injury in applying § 2B1.1(b)(15)(A).[44]

---

[44] Mr. Henderson makes much of the fact that the district court applied § 2B1.1(b)(15)(A) contrary to the recommendation of the probation officer. He cites no authority for the novel proposition that it is categorically improper for a district court to deviate from the recommendations of probation officers in exercising its "broad discretion when imposing sentences." *United States v. McQueen*, 727 F.3d 1144, 1156 (11th Cir. 2013). The Government asked the district court to apply § 2B1.1(b)(15)(A) in its presentencing submissions, and Mr. Henderson was given the opportunity to, and did, respond with his own arguments. *See* Fed. R. Crim. P. 32(h). As we have stated, the district court did not err in applying § 2B1.1(b)(15)(A). The fact that the probation officer disagreed is not an independent basis on which Mr. Henderson can challenge his sentence.

28

## Conclusion

For the reasons set forth in the foregoing opinion, the judgment of the district court is affirmed.