**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 22-13292

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

SHERLEY L. BEAUFILS,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 1:20-cr-00063-DHB-BKE-1

————————————

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

Sherley Beaufils is a nurse practitioner who was found guilty by a jury of sixteen counts of criminal conduct related to a Medicare fraud scheme and sentenced to 87 months' imprisonment. The fraudulent scheme involved submitting thousands of

prescriptions for neck and knee braces, generally covered as durable medical equipment ("DME") under Medicare, for patients who were not actually examined or treated by the appropriate healthcare professional as required by law.

On appeal, Beaufils first challenges the sufficiency of the evidence of the essential "knowing" and "willing" elements for all sixteen of her convictions. Second, she contends the district court erred by failing to give a jointly requested jury instruction on deliberate ignorance. Third, she challenges the district court's denial of her postconviction motion for a new trial. Finally, she challenges the district court's imposition of a two-level obstruction of justice sentencing enhancement for perjury.

After careful review of the record and with the benefit of oral argument, we affirm Beaufils's convictions and sentence.

## I.    FACTUAL    BACKGROUND    &    PROCEDURAL HISTORY

In 2018, Sherley Beaufils was a registered nurse practitioner working at Piedmont Newton Hospital when she took an additional part-time job with a telemedicine company, Royal Physicians Network ("RPN"), and later, another telemedicine job with EnVision IT Perfect ("EIP"). According to Beaufils, she was tasked with reviewing patient charts for written orders for DMEs and would be paid twenty-five dollars per chart. The orders for DME were billed to Medicare, a federal health program that, in certain cases, covered DME like neck and back braces.

During the period at issue, people who qualified for Medicare, known as beneficiaries, were assigned a unique identifier called a Medicare Beneficiary Identifier, which a provider had to submit to make a claim to Medicare for the order. For Medicare to cover the cost of DME, a patient needed to be assessed by a doctor or other licensed medical practitioner, and a licensed practitioner then had to write an order, or prescription, for that DME. *See* 42 C.F.R. §§ 410.38, 424.510. Any treatment plan must have been documented in the ordering provider's medical records for that patient. If the patient's medical record included a treatment plan, but did not document a licensed treating practitioner, such as a doctor or nurse practitioner, then Medicare did not provide payment. Medicare also mandated compliance with scope-of-practice requirements in order to pay for claims. To that end, nurse practitioners must have worked under a supervising physician or a collaborating physician, and the scope of the nurse's practice was limited to that physician's specialty area. *See* 42 C.F.R. § 410.75; O.C.G.A. § 43-34-25. As part of the enrollment application to become a Medicare healthcare provider, the practitioner had to attest they understood that, under the Anti-Kickback statute, 42 U.S.C. § 1320a-7b, deliberately omitting, misrepresenting, or falsifying information in any communication to Medicare was punishable by criminal, civil, or administrative penalties.

Medicare also only paid for telemedicine services if a patient lived in a medically underserved area—for instance, a rural part of the country. However, even with telemedicine, the patient and provider still needed to have had a live conversation, whether over

the phone or through videoconferencing.  *See* 42 C.F.R. §§ 410.78, 410.38.  Medicare did not pay for DME absent compliance with the medical visit provisions.

In 2018, the Federal Bureau of Investigation ("FBI") and the U.S. Department of Health and Human Services ("HHS") were conducting a nationwide joint investigation into Medicare fraud schemes, known as "Operation Brace Yourself."  Beaufils's dramatic spike in DME claims, coupled with inconsistent records regarding medical appointments, caught their attention.  The federal investigation targeted telemarketers who would contact Medicare patients to obtain their medical information and then sell that information to brokers.  The brokers would then collaborate with telemedicine companies to prepare prescriptions for medical devices with the signature of a medical professional.  The brokers sold the patient information and prescription orders as a package to DME companies, which in turn submitted receipts to Medicare for reimbursement, in violation of federal anti-kickback laws.  The investigation targeted those individuals who played any role in the scheme.

FBI Special Agent Douglas Dye learned that Beaufils, along with the rest of the participants in the scheme, were using an internet-based platform called DMERx to generate DME orders.  DMERx, an internet-based portal for electronic medical records, was a "one-stop shop" for providers to obtain all the required information and medical documentation to submit DME sales to Medicare for reimbursement.

Agent Dye reviewed all of Beaufils's DME orders made through the DMERx platform, as well as the backup medical records to support her orders, and found she placed thousands of orders solely for braces. He also uncovered that the patients were not being assessed by doctors or medical professionals at the addresses listed on the medical records or by attending tele-appointments, as required by law and as Beaufils attested to on the signed orders. Furthermore, Agent Dye found orders were often placed in "clusters" whereby multiple orders that included medical and assessment records were generated and electronically signed within minutes, even though it would be impossible for a medical professional to perform the proper assessment in that time. He identified several instances of specific Medicare beneficiaries who were improperly prescribed a brace. Some of those examples included: (1) Beaufils signing an order for a knee brace even though the beneficiary's leg had already been amputated below the knee; (2) her ordering another beneficiary one back, two knee, one shoulder, and one wrist brace even though the patient was bedridden; and (3) "cluster" orders involving multiple beneficiaries all submitted very close in time and, in some instances, within just a few minutes of each other.

On February 23, 2021, a federal grand jury returned a superseding indictment against Beaufils charging her with one count of conspiracy to commit wire and health care fraud under 18 U.S.C. §§ 1349, 2326(1) & (2) (Count 1); five counts of health care fraud under 18 U.S.C. §§ 1347, 2, 2326(1) & (2) (Counts 2–6); one count of conspiracy to receive illegal kickbacks under 42 U.S.C. § 1320a-

7b(b)(1), and to make false statements relating to healthcare matters under 18 U.S.C. § 1035, all in violation of 18 U.S.C. § 371 (Count 7); five counts of making false statements relating to healthcare matters under 18 U.S.C. § 1035(a)(1) & 2 (Counts 8–12); five counts of aggravated identity theft under 18 U.S.C. § 1028A (Counts 13–17); and one count of making false statements to a department or agency of the United States under 18 U.S.C. § 1001 (Count 18).[1]  Beaufils pled not guilty, and the case proceeded to trial.

### A.  Trial Evidence Relevant to Appeal

On appeal, Beaufils only challenges the sufficiency of the evidence at trial with respect to whether she knowingly engaged in any criminal activity.  To that end, we focus our summary of the evidence on the facts relevant to that inquiry.

#### i.    Testimony of fraud investigator Stephen Quindoza

First, the government called Stephen Quindoza, a private fraud investigator with whom the federal government contracted. He testified in part to the following.  While working for the telemedicine companies, Beaufils was assigned 942 patient records to review and input claims for, but she never directly submitted any Medicare reimbursement claims for 934 of these patients.  Instead, she would order DME without filing a Medicare claim.  Beaufils ordered 3,800 items of DME, around four braces a patient.  These

---

[1] The government dismissed Count 18 prior to trial, and it was not presented to the jury.

DME items, consisting particularly of orthotics, were sent to fifty-seven different suppliers. The total bill by these fifty-seven different suppliers was over $3.1 million, with Medicare reimbursing over $1.6 million back to those suppliers.

Of those 942 patients, 543 patients received a lower back brace, and Medicare paid the suppliers just over $427,000 for those braces alone. While Medicare allowed for providers to bill for various types of back, knee, and wrist braces with varying features for different injuries and treatments, Beaufils consistently only ordered one particular type of each brace, which was unusual and indicated that the order was not individualized. Additionally, before March 2015, she never ordered any braces.

Quindoza stated the majority of Beaufils's listed patients lived at least 60 miles from her registered practices, which was "unusual." Quindoza also discussed the Medicare claims he found that corresponded with the five Medicare beneficiaries who ended up becoming the bases for the five substantive counts of health care fraud. He described Beaufils's orders for multiple DMEs for each of those beneficiaries, referred to in this opinion as (1) P.W.; (2) K.M.; (3) G.S.; (4) J.B.; and (5) J.T.

### ii.   *Agent Dye*

Next, Agent Dye testified as follows regarding his findings during the "Operation Brace Yourself" investigation and about Beaufils's specific role. He found numerous issues with the documents he reviewed and used the DMERx and patient records of a patient named Jessie Kimbrough to illustrate the types of

deficiencies he discovered.  That patient record listed Beaufils, included her nurse practitioner identification number, and contained exam notes that indicated that Kimbrough wanted to utilize orthotic bracing for her back, knee, and shoulder pain, with the treatment goal to increase the performance of activities of daily living and to increase Kimbrough's overall quality of life.  The document contained the statement, "[b]ased on my discussion with Jessie Kimbrough and evaluation of her condition, I am ordering the following item," as well as the following attestation, "I, Sherley L. Beaufils, NP, do hereby attest that the above information is true, accurate, and complete to the best of my knowledge.  I hereby affirm this documentation as part of this patient's medical record. Electronically signed by Sherley L. Beaufils, NP, on December 8, 2018, at 12:59 p.m. Eastern Standard Time."

Beaufils signed this order.  A Miami-based medical supply company submitted this signed claim, which listed Beaufils as the ordering provider, to Medicare for reimbursement.  Medicare rejected this claim, however, because Kimbrough was deceased. Kimbrough had been in hospice, where she was "lethargic, unable to follow any commands," completely dependent on her caregiver, nonverbal and, as of December 4, 2018, sleeping for twenty-two hours or more per day.  Kimbrough died on December 8, 2018, around 1:15 AM, twelve hours before Beaufils signed her order. Beaufils's records did not mention that Kimbrough was dying or in hospice.

Overall, Beaufils signed multiple orders that were inconsistent with each other. For example, in two orders for the same person, the patient's listed weight showed a difference of 100 pounds and the order identified different causes for the pain and provided conflicting information on the patient's surgeries for the same health issue. This record had the following attestation from Beaufils:

> I, Sherley L. Beaufils, verify and confirm this order for the above-named patient and certify that I have personally performed the assessment of the patient for the prescribed treatment and device and verify that it is reasonably and medically necessary according to accepted standards of medical practice within the community for this patient's medical condition. I hereby affirm this documentation as part of this patient's medical record.

Agent Dye also testified to examples of a "cluster" pattern in brace orders, including one batch of ten-page orders for two different patients, two different sets of medical records, and two different sets of tests that were generated and electronically signed just one minute apart. Beaufils signed "cluster" orders shortly after receiving an email from Tommorra Hackler at RPN that advised her that she had charts ready in the DMERx portal and that were overdue for the 24- to 48-hour turnaround time period. In particular, on one such patient record, Beaufils attested that she conducted a diagnostic examination of and tests on the patient and that, per a

conversation with the patient, she determined the patient needed the same model of back brace that she had ordered for other patients. Six minutes after she placed that order, she placed another order, which described multiple diagnostic examinations and a conversation with that patient, and then she placed three more orders for different patients. Shortly after receiving the prompt from Hackler and signing the records, Beaufils replied through her email: "Done."

Agent Dye then testified to evidence that Beaufils was, in fact, reading the statements made in the DMERx portal, as well as the orders she was signing, including that she emailed her telemedicine company asking for completion on a DMERx file that was missing a key component of the exam. She also corrected an order issued through a different order platform, EchoSign, where she had mistakenly been referred to as "Dr. Sherley Beaufils." Agent Dye explained that these actions showed that Beaufils did not have "confusion" that these orders were other people's patients and other doctors' orders. For instance, she had replied to at least one person, saying "[t]hank you for reaching out. Per your request I have reviewed and signed the prescriptions." He also pointed to an email from EIP that indicated that a brace had already been sold at the time Beaufils was being instructed to complete the related forms and, thus, Beaufils had knowledge that the orders were fraudulent.

After interviewing some of Beaufils's patients, it became clear to Agent Dye that Beaufils's patients were not being assessed

by medical professionals either in person or virtually, and none of the assigned patients had spoken to her on the phone. Beaufils's records from her Google account also showed that she had watched two videos, "DMERx Knee Pain" and "DMERx Free Cash," on May 18, 2018, shortly after she started completing physician orders in the DMERx portal. Beaufils's bank records reflected a pattern of deposits from EIP of one or two thousand dollars every other week, which equaled approximately $25 per brace that she ordered for patients.

Agent Dye also testified about evidence that showed Beaufils was aware her actions were unlawful. According to Beaufils's credentialing application for the State of Georgia, she was asked specifically about the statute, and was warned against receiving, and given examples of, illegal kickbacks. One example given in the application explicitly mentioned profiting from referring patients to a DME company. Beaufils signed this document. According to her collaborative practice agreement, Beaufils was limited to practicing in the emergency department at Spalding Regional Medical Center in Griffin, Georgia, and she could not practice beyond the scope of the authorizations given in the agreement. Beaufils, her supervising physician, and another designated physician signed this agreement. The address that appeared on Beaufils's DMERx orders was for Wellstar, the hospital system that owned Spalding Regional, but it was a different address from the Spalding Regional Hospital. Wellstar's records custodian looked through their system to determine whether any of the patients that Beaufils ordered braces for were patients at Wellstar, and the custodian found no

records of examinations or office visits at any Wellstar locations for the patients on the specified dates.

Finally, Agent Dye testified as to the five Medicare beneficiaries for whom payment was sought, which provided the basis for the charges against Beaufils and her co-conspirators. As to P.W., records showed an exam date of October 12, 2018, for "[k]nee pain, back pain, shoulder pain, and wrist hand pain" and that Beaufils had evaluated P.W.'s knee and discussed P.W.'s knee pain with her. However, per an interview with P.W. and per her medical records, P.W.'s left leg had been amputated below the knee six months before Beaufils indicated that she had performed diagnostic examinations on P.W.'s knee. As to G.S., who did not appear at the trial because, according to her husband, she was on her deathbed, Beaufils ordered "one back brace, two knee braces, one shoulder brace, [and] one wrist brace," the maximum number of braces, which the conspirators referred to as "the Iron Man." As to K.M., Beaufils submitted the order five minutes after putting in an order for a different patient. Similarly, the order for J.B. was part of a cluster of four different orders for four different patients, all transmitted within the span of eight minutes. Beaufils also ordered braces for J.B. through a second platform. The first order for J.T. occurred three minutes after an order for a different patient and occurred in a cluster of four patient orders that Beaufils completed in eight minutes.

### iii.    Testimony of co-conspirators

The government presented the testimony of two participants of the fraud scheme who were investigated and eventually pleaded guilty to charged offenses. First, Jonathan Tanner, a "broker," testified that, as part of the scheme, he paid a company called R&L Senior Marketing, and his understanding was that part of this payment was to compensate Beaufils for her role in ordering the braces. His DME companies would then submit claims to Medicare for the braces Beaufils ordered. On cross examination, Tanner testified that, while he had purchased several of the orders that Beaufils authorized, he did not know her personally, had never had any contact with her, and had never paid her directly.

Second, the government called Dr. Jawad Salim, who pleaded guilty to charges based on conduct similar to Beaufils's alleged violations. He testified that he would log in to the DMERx portal to access a list of patients with medical needs. When Salim selected a patient, the system would pull up their file, which included a summary of their primary medical complaint (such as back or knee pain), demographic information, and insurance information. The DMERx portal would then prompt him to describe the etiology of the medical complaint and provide information about the physical examination he conducted on the patient. Salim's information would then be prepopulated. The system would not allow him to sign and submit the orders without completing every one of the blank fields of the online medical form, including fields like "notes for the examining clinician," and

"patient exam request."  Even if Salim did not perform a medical examination, he still had to complete that section.  Finally, Salim would have to attest that the information he inputted about the patient was true, that he had the proper medical license, and that he had a valid provider-patient relationship.

### iv.    Testimony from patients and caretakers

K.M. testified that she was not Beaufils's patient, Beaufils never examined or treated her, and she never visited Beaufils's medical practice in Atlanta.  Further, K.M. had never seen the DMERx document regarding her.  That document, at the top, said "Provider Sherley L. Beaufils," and K.M. explained there were multiple incorrect statements in the document, including her weight being wrong and that she sustained injuries from long-distance running and playing volleyball, activities in which she never engaged. K.M. testified that she received a back brace in the mail that she had not ordered, and that she never gave Beaufils permission to use her name or other information in those records.

Similarly, J.B.'s daughter, Christy B., her primary caretaker, testified that, in 2018, some orthotic braces arrived at her mother's home that her mother had not ordered, but that her mother had received a call regarding her pain.  Christy maintained that, before the braces arrived, Beaufils had never examined J.B., J.B. had never visited Beaufils at the medical practice, J.B. had never received any type of consultation on the phone or a video conference with Beaufils, and Christy did not recognize Beaufils.  Christy testified that, to her knowledge, Beaufils had never conducted any of the

documented tests on her mother's left and right knees. Moreover, in 2018, J.B. was mainly confined to a wheelchair, and her ability to walk was "very, very, very limited."

G.S., P.W., and J.T.'s primary physicians, who were not involved in the fraud scheme, testified regarding their respective patients' specific diagnoses and treatment plans, none of which included orthopedic braces from Beaufils. They also confirmed that several aspects of the DMERx records were inaccurate, including those patients' medical histories and diagnoses.

Dr. Jehangir Pirzada, an emergency medicine physician, testified that he worked at Wellstar Spalding in Griffin, Georgia, where he supervised other medical practitioners, including Beaufils, from 2016 to January 2018. He confirmed that no orders Beaufils wrote for orthopedic braces between February 2018 and April 2019 were done under his supervision.

> v.     Beaufils's trial testimony

Beaufils testified in her own defense as follows. She became involved in telemedicine after receiving a phone call from a recruiter who was seeking individuals to review charts that a physician had already completed, with Beaufils reviewing the charts only for consistency. This recruiter represented RPN and EIP, and she was Beaufils's only contact with either company. Beaufils's understanding of her job description was that she was supposed to review charts that already had been completed by other physicians and that those physicians would sign the charts after her review. She reviewed the charts when she had the time to do it, received

$25 per chart that she reviewed, and was paid about every two weeks. Prior to this arrangement, she did not have any knowledge of the DMERx platform.

She testified that when she would log in to the DMERx portal, the charts would already contain the patient's demographic data, and the provider assigned to the patient would already be entered into the system. RPN did not ask her to be a provider for these patients. The patient's chart also would describe the patient's medical condition, as well as any examinations that were done. Beaufils testified that she did not obtain the patients' medical complaints directly from them, nor did she perform the examinations. She never accessed any charts on the DMERx portal that did not already contain the patient's medical information, and all of the patients' charts had providers that were assigned to them. Beaufils said that no one from the RPN or EIP told her that they were committing health care fraud, and she had no reason to believe that these patients came from "brokers."

After reviewing charts for about 12 months, Beaufils received a call from the insurance company Cigna requesting more documentation for a claim that did not list a supervising physician. She followed up by trying to contact someone at RPN because she felt like her license was "in jeopardy," as she could not be the sole provider on anyone's claim. She then spoke with Charlene Frame, the owner of RPN, who informed Beaufils that the person who had recruited Beaufils had been terminated because of fraudulent activities. According to Beaufils, Frame reassured her that, after

Beaufils's review, the charts were returned to the physicians for a final review and attestation. Frame's assistant then wrote Beaufils a lengthy email stating that Beaufils should not review charts for two of RPN's providers that Beaufils did not know. Beaufils said she left RPN because she never received a clear answer as to why she had been listed as the sole provider on the charts Cigna referenced.

Beaufils also testified that her "biggest concern" with the charts RPN produced was who they listed as the primary provider and whether every entry made by different providers was properly attributed to them. She asserted that her role was to review the charts for inconsistencies like grammatical errors and whether the chief complaint aligned with the basis for the patient's treatment. She maintained that she did not critique a provider's chosen treatment or make her own independent assessment as to the medical necessity for the DME ordered. In total, she alleged that she received between $37,000 and $38,000 working for RPN over a 14-month period.

On cross examination, Beaufils admitted that she never contacted the patients listed on the charts she reviewed. She also acknowledged that her name was listed in at least one medical chart next to the word "Provider," and the attestation signature line shows her name as well. She testified that, although no other provider was named on the record, she thought that the final documentation was supposed to include an attestation from "everyone" who accessed the record. Initially, she stated that the

provider's name appeared on the portal she viewed, but she later changed that testimony to say that the provider's name for record-keeping purposes appeared within the chart.

When asked about an email in which she wrote, "I have reviewed and signed the prescriptions," Beaufils testified that "signing it, that's part of the job because it's outlined with the assessments . . . . [T]herefore, yes I am signing the chart that you've assigned me to review." She emphasized that she reviewed and signed the entire chart, which included prescriptions for braces. She asserted that, under law, a medical doctor had to give her authorization for any prescription and, therefore, they had to attest to the final review of the documents. When asked about the inconsistencies between what the medical documentation claimed and what she indicated on the charts she completed, Beaufils responded that she asked her company for clarification about its processes. She stated that she wanted to make it seem urgent because they were taking a while to respond, so she asked things like "are you putting my name on charts where these patients are not even—are they fictitious patients and things of that nature?" She said that was when she had an opportunity to speak with Frame. She then testified that she continued writing orders after communicating with Cigna. She testified that Frame told her that the final paperwork was supposed to have everyone's provider information on it.

The government then pressed Beaufils about how she was compensated, noting that in her first informal interview with

Agent Dye she said she only got paid per patient chart reviewed if the patient was prescribed a DME.

Beaufils further testified that, if she needed any clarifications, she would return the chart but would not call the patient directly. The government then reminded her of her earlier statement to the FBI where she indicated that she had called patients and asked them to perform diagnostic knee assessments. Beaufils attempted to rectify the two statements, claiming that she had the option to call and verify things with the patients themselves, but did not. She testified that any explanation she gave to Agent Dye as to how she would perform certain examinations was from "a review perspective" and answered how she would hypothetically perform examinations if she had to perform them over the phone, not whether she had performed them. Beaufils again confirmed that, despite her statement to Agent Dye, she did not call the patients.

In response to the court's question regarding what EIP paid Beaufils to do, she testified that she was getting paid for quality control, and to make sure the paperwork looked correct. When asked about the order of an extra-large brace for a patient weighing less than 100 pounds, she confirmed that was the type of quality control she was hired to perform. The defense then rested without redirect.

### vi.    *Frame's Rebuttal Testimony*

The government called Charlene Frame as a rebuttal witness. Frame testified that, between 2017 and 2019, she owned RPN and EIP, two related telemedicine companies. She admitted that

she had pleaded guilty to a conspiracy charge related to paying providers, including Beaufils, to authorize orders for orthotic braces. Frame denied telling Beaufils, either directly or through her other employees, that the files she was reviewing were first being seen by other providers. She also denied telling Beaufils that all she had to do was sign the orders because the examinations had already been done. Frame stated that the DMERx form did not require the field of "primary care physician" to be completed and that no other provider's signature was required before the order was submitted to Medicare for payment. She testified that Beaufils's signature alone, as a nurse practitioner, was sufficient to submit a bill to Medicare for payment. As to the primary physician field in the records, Frame claimed she had never seen that field filled out.

### B. Jury Instructions

Prior to trial, the parties filed a "Joint Request to Charge," which included a "deliberate ignorance" jury instruction. The proposed instruction provided:

> Deliberate Ignorance as Proof of Knowledge: If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed—unless the Defendant actually believed the fact didn't exist. "Deliberate avoidance of positive knowledge"—which is the equivalent of knowledge—occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or

she can deny knowledge of the package's contents. But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that the Defendant knew about the possession of the controlled substance.

The court informed counsel that, as to the jury charges, it had "consolidate[d] the general information about the conspiracy charges" to avoid redundancy, and that this was "the only significant change" it made to the parties' proposed jury instructions.

During its closing argument, the government stated in pertinent part:

Ladies and gentlemen, the last thing I want to talk to you about is called deliberate ignorance which is what the Judge is going to charge you about. It's sometimes called the ostrich defense. It is just sticking your head in the sand when you should be asking questions. When she is telling you that she received orders that were already filled out that talks about these exams that had been done and her—the pronoun "I" is all through those documents saying I did this and I did that and she knew she didn't do it, she should have been asking questions and she didn't, and she is guilty of all of the counts in the indictment and we ask you to return a verdict that reflects the truth of this matter. Thank you.

Despite the parties' Joint Request, and its statement to the parties, the jury instructions did not include any language regarding "deliberate ignorance." After issuing the jury charge, neither party

objected to the court's instructions. As part of its jury charges, the court explained that "it is [the court's] duty to instruct you on the rules of law that you must follow and apply in deciding this case," that the jury "must follow the law as [the court] explains," that the jury must "consider only the evidence . . . admitted in this case," and that "nothing the lawyers say is evidence" or binding.

### C. *Jury Verdict and Sentencing Enhancement for Perjury*

The jury acquitted Beaufils of the conspiracy to commit health care fraud charge (Count 1), but found her guilty of Counts 2 through 17. In anticipation of sentencing, a probation officer prepared a presentence investigation report ("PSI"). In calculating Beaufils's offense level, the probation officer applied a two-level enhancement for obstruction of justice, under U.S.S.G. § 3C1.1, for committing perjury at trial.

Beaufils objected to the enhancement, arguing that her testimony was based on her subjective belief regarding the billing process and a lack of intent to commit a crime. She tried to discredit Frame's testimony by characterizing her as a "convicted felon and admitted fraudster" who lacked any concrete evidence to support her otherwise unreliable testimony. The government argued the enhancement was proper because Beaufils lied on the witness stand, as evidenced in part by Frame's clear statement that she paid Beaufils to order the braces. The government pointed to the totality of the evidence supporting Beaufils's knowledge and unlawful acts, including: (1) medical records Beaufils signed attesting that she examined a patient who was deceased at the time, (2) Beaufils's

email messages revealing that she knew she was prescribing medical equipment, i.e. the braces, and not just reviewing patient records, (3) orders she continued to sign even after discovering that one of the records submitted contained false statements, and (4) the discrepancies between her testimony and the statements she made, as transcribed, in her initial interview with the FBI. All of this evidence, the government maintained, amply demonstrated that Beaufils lied on the witness stand. The government also relied on the jury's guilty verdict as further support that her testimony lacked credibility and, therefore, the enhancement was justified.

At the sentencing hearing, the court characterized Beaufils's testimony as making "a specific and wholesale denial of the actual criminal acts, and this was . . . incrementally modified, altered or withdrawn as the case may be when on cross examination she was confronted by prior inconsistencies." The court emphasized that it could not review her testimony in a vacuum, but had to consider it as a whole, including the "free ranging cross examination and her sometimes enthusiastic denials and her attempt to reconcile the facts seemingly proven by the evidence at trial with prior inconsistencies." The court found that, "[o]n the whole[,] Mrs. Beaufils simply lied to the jury." Therefore, it overruled her objection and applied the two-level enhancement for obstruction of justice. It then assigned her a total offense level of 26 and a criminal history category of I, and sentenced her to 87 months of imprisonment which was the low end of the guideline range.

### D.  *Beaufils's Motion for a New Trial*

On September 22, 2022, prior to filing her notice of appeal, Beaufils, through new counsel, moved for a new trial pursuant to Federal Rule of Criminal Procedure 33.  Beaufils conceded that her motion for a new trial was untimely, but she argued that she could establish excusable neglect based on her trial attorney's failure to abide by her earlier request to file the motion.  She claimed she sent him a text message on February 8, 2022, asking that the motion be filed on the ground that there was evidence that had not been presented at trial.  She stated that trial counsel believed that there were no grounds for a motion for a new trial, and told her that there would not be any further activity in the case, other than the PSI, until sentencing, and then Beaufils could appeal.  Beaufils contended that, at a minimum, her text message clearly showed that she always intended to seek a new trial and that she had a claim for ineffective assistance of counsel for failure to introduce the "evidence not presented."  She asserted that her trial counsel expressly rejected her request for a new trial without researching the viability of such a motion and did so without explaining to her the deadlines, parameters, and need for a new attorney if she wished to raise issues of ineffective assistance of counsel.

Before the government responded and before the court ruled on her motion, Beaufils filed her notice of appeal on September 28, 2022, after which the government responded in opposition.  On October 6, 2022, the district court denied Beaufils's motion for a new trial.  The court ruled that Beaufils's motion was untimely

because it was due within 14 days of the jury's guilty verdict, making the actual deadline February 15, 2022. As to Beaufils's claim of excusable neglect, the court informed Beaufils that the motion was not the proper vehicle to litigate an ineffective assistance of counsel claim. The court also stated that, to the extent trial counsel's assessment regarding the strength of such a motion was incorrect, counsel's misunderstanding of the law does not constitute excusable neglect, relying on Federal Rule of Criminal Procedure 45(b) and circuit precedent. The parties then proceeded with this appeal.

## II.    STANDARDS OF REVIEW

There are multiple standards of review which govern this appeal. First, we review whether evidence proffered at trial is sufficient to support a conviction *de novo*. *United States v. Fries*, 725 F.3d 1286, 1291 (11th Cir. 2013). When the defendant moves for a judgment of acquittal at the close of the government's case but fails to renew the motion after all of the evidence has been entered into the record, we will reverse the conviction "only where doing so is necessary to prevent a manifest miscarriage of justice." *Id.*; *see United States v. Waters*, 937 F.3d 1344, 1356 (11th Cir. 2019). A manifest miscarriage of justice means "either that the record is devoid of evidence of an essential element of the crime or 'that the evidence on a key element of the offense is so tenuous that a conviction would be shocking.'" *Fries*, 725 F.3d at 1291 (quoting *United States v. Milkintas*, 470 F.3d 1339, 1343 (11th Cir. 2006)). In considering if there has been a manifest miscarriage of justice, we view the evidence "in the light most favorable to the government and

accept all reasonable inferences and credibility determinations that support the jury's verdict." *Milkintas*, 470 F.3d at 1343.

We generally review a district court's jury instructions de novo, but apply an abuse of discretion standard if a party fails to object to the instructions. *United States v. Starke*, 62 F.3d 1374, 1381 (11th Cir. 1995); *see also* FED. R. CRIM. P. 30(d). To establish plain error, "there must be (1) an error (2) that is plain and (3) that has affected the defendant's substantial rights." *United States v. Madden*, 733 F.3d 1314, 1320 (11th Cir. 2013). Yet, even when all three elements are met, we will not reverse a conviction for plain error unless, considering the charge as a whole, it is likely to result in "a grave miscarriage of justice, or the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Starke*, 62 F.3d at 1381 (internal quotation marks and citation omitted); *United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022).

When reviewing a district court's application of an obstruction of justice sentencing enhancement, we review the district court's factual findings for clear error, but review *de novo* its application of the Sentencing Guidelines to those facts. *United States v. Singer*, 963 F.3d 1144, 1164 (11th Cir. 2020); *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002). In doing so, we give significant deference to the district court's credibility assessments. *Singh*, 291 F.3d at 763.

We review a district court's denial of a motion for a new trial based on untimeliness for abuse of discretion. *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir. 2013); *United States v. Smith*,

918 F.2d 1501, 1509 (11th Cir. 1990). "A district court abuses its discretion when it misapplies the law in reaching its decision or bases its decision on findings of fact that are clearly erroneous." *Scrushy*, 721 F.3d at 1303. This standard allows for a "range of choice for the district court," as long as that choice is not a "clear error of judgment." *Rasbury v. IRS (In re Rasbury)*, 24 F.3d 159, 168 (11th Cir. 1994) (citation omitted).

## III.  DISCUSSION

Our analysis proceeds in four parts. First, we consider whether the government presented sufficient evidence to support all sixteen of Beaufils's convictions. Second, we consider whether the district court erred in failing to give the jointly requested jury charge on deliberate ignorance. Third, we consider whether the district court erred in applying a two-level enhancement for perjury under U.S.S.G. § 3C1.1 at sentencing. Finally, we consider whether the district court abused its discretion in denying Beaufils's motion for a new trial on the basis that she had not shown excusable neglect for its untimeliness.

### A.  Sufficiency of the Evidence

On appeal, Beaufils argues that the evidence at trial was insufficient to support any of her convictions because the government failed to prove the essential elements of "knowledge" and

"intent" required under each charged offense.[2] A defendant acts willfully when she knows her conduct is unlawful, and acts knowingly when she is aware of the facts that make up the offense. *United States v. Henderson*, 893 F.3d 1338, 1348 (11th Cir. 2018). The government can prove knowledge or intent through circumstantial evidence. *Id.* With this in mind, we evaluate whether the government presented enough evidence of intent and knowledge such that a conviction for each of the charges is not a clear miscarriage of justice. *Fries*, 725 F.3d at 1291.

### i. Health care fraud

Beaufils was convicted of five counts of health care fraud under 18 U.S.C. § 1347(a). To prove that a defendant violated Section 1347(a), the government must prove the following elements:

> (1) that the defendant knowingly and willfully executed a scheme or artifice (a) to defraud a health care benefit program as defined in 18 U.S.C. § 24(b) or (b) to obtain money or property owned by or under the custody and control of a health care benefit program by means of false or fraudulent pretenses, representations, or promises;

---

[2] *See* 18 U.S.C. § 1347(a) (health care fraud); 18 U.S.C. § 1035(a)(2) (false statements related to health care fraud); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 371 (conspiracy). These offenses require a showing of either willful or knowing conduct, or both.

(2) that the health care benefit program affected interstate commerce;

(3) that the false pretenses, representations, or promises related to a material fact;

(4) that the defendant acted willfully and with intent to defraud; and

(5) that the defendant acted in connection with the delivery of or payment for healthcare benefits, items or services.

*Scott*, 61 F.4th at 863–64. Beaufils argues that the government failed to prove she had knowledge of the fraudulent scheme or that she intended to defraud Medicare. She contends that, instead, the evidence showed that she had no knowledge of the fraudulent scheme and was just completing her work tasks as directed.

The trial record belies her theory of defense. As to knowledge, the government submitted evidence that Beaufils certified on four different occasions that she would "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance." Beaufils testified that, as a nurse practitioner, she was required to be under the supervision of a physician. Indeed, she had signed a collaborative practice agreement that limited the scope of her authorization to provide health services to the specialty area or field of her supervising physician and, more specifically, to the emergency department at Spaling Regional Medical Center in Griffin, Georgia. Beaufils testified that a physician's name would be

provided on the charts she was reviewing, a claim that she later contradicted.

Her supervising physician Dr. Pirzada testified that none of the orders that Beaufils wrote for orthotic braces occurred under his supervision. Further, there was evidence that the platform she was using, DMERx, informed Beaufils, as well as other people utilizing the same platform, that she was listed as the patient's provider. The records from DMERx did not list another provider as having completed patient examinations, and there was evidence presented showing that to complete the orders, Beaufils had to complete the section regarding examinations that purportedly took place, even though she had not performed these examinations. Beaufils's testimony that someone at RPN told her that another medical doctor was seeing the patients and was required to give the final attestation was rebutted by the testimony of Frame, who stated that neither she nor any of her employees told Beaufils that the patients whose files she reviewed were first cared for by other providers.

While Beaufils argues on appeal that Frame is not credible, we must accept all reasonable inferences and credibility determinations the jury made. *Milkintas*, 470 F.3d at 1343. Moreover, the jury could have disbelieved Beaufils's own testimony and considered her statements as substantive evidence of her guilt. *Brown*, 53 F.3d at 314. Under our standard of review, we must respect the jury's choice as to how much credibility to extend to the witnesses' testimony, including Beaufils's.

Evidence from the DMERx records also supports the jury's conclusion that Beaufils was knowingly and willfully engaging in fraud. She routinely signed multiple orders in short time clusters, which matched confirmation emails she sent to RPN. Beaufils also electronically signed attestations that the information contained in the patients' records was accurate and that she personally performed the patient assessments, all of which was untrue. In fact, she later admitted that she had never performed any examinations or called the patients, and at least two of the patients prescribed DMEs had never seen or heard of Beaufils. The orders themselves contained inconsistent and inaccurate information, like a knee brace for a woman whose leg had been amputated, a brace to improve the quality of life for a woman in hospice, and an extra-large brace for a woman who weighed less than 100 pounds. The government also introduced email communications indicating that Beaufils did in fact read these orders.

Beaufils's internet search history showed that she had viewed YouTube videos entitled, "DMERx Knee Pain" and "DMERx Free Cash," even though her nurse practitioner credentialing application explicitly warned her about referring patients to DME companies. Finally, as to the health care fraud convictions, Beaufils contradicted the earlier statements she gave to the FBI and it was, therefore, reasonable for the jury to infer that she knew she was engaging in fraud. *Milkintas*, 470 F.3d at 1343. Viewing the evidence in the light most favorable to the jury verdict, the government presented enough evidence of intent and knowledge such

that Beaufils's convictions under 18 U.S.C. § 1347(a) are not a clear miscarriage of justice.  *See id.*; *Fries*, 725 F.3d at 1291.

Accordingly, we affirm Beaufils's convictions on these five counts.

### ii.   *False statements related to health care fraud*

Beaufils also was convicted of five counts of making false statements related to healthcare matters under 18 U.S.C. § 1035(a)(2).  In order to convict Beaufils under Section 1035, the government had to establish that she "knowingly and willfully" made "any materially false, fictious, or fraudulent statements or representations," or made or used "any materially false writing or document knowing the same to contain any materially false, fictious, or fraudulent statement or entry, in connection with the delivery or payment for healthcare benefits, items, or services . . . ." 18 U.S.C. § 1035(a)(2).  Beaufils contends the government failed to present sufficient evidence that she "knowingly and willfully" made any false statements because she was not aware that the patient records were falsified.

However, the evidence described above regarding the health care fraud counts, including the numerous inconsistencies in her orders for braces and overall knowledge regarding the scheme, also speaks to her intent and willingness to violate Section 1035(a)(2).  Even if Beaufils was not aware that the medical information was falsified, evidence showed false attestations in connection with the payment for healthcare items. 18 U.S.C. § 1035(a)(2). Specifically, the medical records include Beaufils's attestations to

conversations with patients, examinations of patients, and verification of the necessity of treatments according to the accepted standards of medical practice. According to Beaufils's own testimony, however, she did not call or examine any of these patients, meaning these attestations were untrue. Beaufils knew that orthotic braces were outside of her authorized scope of nursing practice, which was emergency medicine and, therefore, these orders in and of themselves were evidence that she knowingly made false representations to Medicare. *See* 18 U.S.C. § 1035(a)(2). Again, viewing the evidence in the light most favorable to the jury verdict, the record does not demonstrate a clear miscarriage of justice. *See Milkintas*, 470 F.3d at 1343. Accordingly, we affirm these convictions as well.

### iii. *Aggravated identity theft*

Next, Beaufils challenges her conviction on five counts of aggravated identity theft under 18 U.S.C. § 1028A. To prove aggravated identity theft under Section 1028A, the government must establish that "during and in relation" to an enumerated predicate felony—here, Beaufils's false statements related to health care fraud—she "knowingly transfer[ed], possesse[d], or [used], without lawful authority, a means of identification of another person . . . ." 18 U.S.C. § 1028A. Beaufils concedes that her convictions for aggravated identity theft are wholly dependent on whether the jury found her guilty of making false statements related to health care fraud under 18 U.S.C. § 1035(a)(2) (Counts 8 through 12). Thus, because the government presented sufficient evidence for the

underlying felonies, we also affirm her convictions for aggravated identity theft. *See United States v. Barrington*, 648 F.3d 1178, 1193 (11th Cir. 2011); 18 U.S.C. § 1028A.

### iv. Conspiracy

Finally, Beaufils was convicted of one count of conspiracy under 18 U.S.C. § 371 for the purpose of receiving kickbacks and making false statements about her treatment of patients who received the DMEs. To prove conspiracy under Section 371, the government had to establish "(1) that a conspiracy existed; (2) that the defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." *United States v. Sosa*, 777 F.3d 1279, 1290 (11th Cir. 2015) (citation omitted). While direct evidence of knowledge regarding the conspiracy is ideal, circumstantial evidence will suffice. *United States v. Duldulao*, 87 F.4th 1239, 1262 (11th Cir. 2023). Such circumstantial evidence can be based on inferences from the participants' conduct, or a co-conspirator's testimony. *See United States v. Azmat*, 805 F.3d 1018, 1035 (11th Cir. 2015); *United States v. Nerey*, 877 F.3d 956, 969 (11th Cir. 2017) ("Testimony of a co-conspirator, even if uncorroborated, [can be] sufficient to support a conviction." (quoting *United States v. Broadwell*, 870 F.2d 594, 601 (11th Cir. 1989))).

The trial evidence supports the jury conviction on the conspiracy count. First, there was evidence that she ordered orthotic braces for patients whom she had never spoken with or met. Frame admitted the DME referral scheme was a fraudulent enterprise and that she paid Beaufils to authorize orders for orthotic

braces. Beaufils also admitted to receiving payments per chart that she reviewed. When RPN or EIP would prompt her to submit new charts or complete those already submitted, she would do so right away without any further evaluation of the form, the patient's chart, or outreach to the patient. Beaufils's contract with WellStar clearly defined such behavior, i.e., making patient referrals and getting illegally compensated for doing so, as violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1).

Furthermore, she knew that she could not be listed as the sole provider on a patient's Medicare claim. Yet, she continued to review patient charts and submit them under only her name even after a Cigna representative notified her that doing so was improper. Viewing the evidence in the light most favorable to the jury verdict, there was not a clear miscarriage of justice. The government presented enough evidence to show that Beaufils knowingly and willfully conspired with RPN and EIP to make false medical statements and to receive kickbacks related to doing so. *Milkintas*, 470 F.3d at 1343.

### B. Jury Instructions

Next, Beaufils argues that the district court plainly erred and affected her substantial rights when it did not inform the parties how it would rule on the proposed jury charge on deliberate ignorance and subsequently failed to give the instruction when it charged the jury.

Under Federal Rule of Criminal Procedure 30(b), the trial court "*must* inform the parties before closing arguments how it

intends to rule on the requested [jury] instructions." FED. R. CRIM. P. 30(b) (emphasis added). In general, we "ha[ve] only required substantial compliance with [Federal Rule of Criminal Procedure] Rule 30[,] and a defendant must show prejudice before his conviction will be reversed." *United States v. Lopez*, 590 F.3d 1238, 1252–53 (11th Cir. 2009) (quoting *United States v. Clark,* 732 F.2d 1536, 1541 (11th Cir. 1984)). For an error to be prejudicial, "[i]t must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). Prejudice arises from a Rule 30 violation "when the change in the instructions is substantial, when the instructions repudiate counsel's arguments, or when the instructions impair the effectiveness of those arguments." *Lopez*, 590 F.3d at 1253 (quoting *United States v. Descent*, 292 F.3d 703, 707 (11th Cir. 2002)). An error is generally not prejudicial to a defendant when the district court's erroneous instruction was "made at the government's expense and made acquittals more likely." *United States v. Beasley*, 72 F.3d 1518, 1529 n.9 (11th Cir. 1996).

Both parties requested a jury instruction about deliberate ignorance and, thus, the district court committed plain error when it failed to inform the parties of its intended ruling on that requested charge, especially when it then did not give the jury that charge. *See United States v. Bankston*, 945 F.3d 1316, 1318 (11th Cir. 2019) (explaining "[a]n error is obvious," or plain, "when it flies in the face of either binding precedent or 'the explicit language of a statute or rule'" (quoting *United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005))). However, we only require substantial

compliance with Rule 30, and Beaufils still must show she was prejudiced by this error for this Court to reverse her conviction.[3] *Lopez*, 590 F.3d at 1252–53; *Clark*, 732 F.2d at 1541. Here, Beaufils contends that due to the lack of any instruction on deliberate ignorance, the jury relied on the statement of law the government made during its closing arguments which, she maintains, was incorrect. She argues this statement failed to establish that the government must prove deliberate ignorance beyond a reasonable doubt and improperly shifted the burden to Beaufils to actively discover the illegality of her actions. She contends that, without the proper instruction, the jury likely convicted her based on an incorrect "negligence standard." Beaufils's arguments are unconvincing.

To start, the district court sufficiently instructed the jury on how to treat the remarks the government made during its closing

---

[3] Although we have not affirmatively applied the "substantial compliance" rule in the context of Rule 30(b) where both parties requested an instruction but the court did not give the instruction and did not give the parties notice that it was not going to do so, we generally have required "substantial compliance" in the vast spectrum of Rule 30(b) scenarios. *See Lopez,* 590 F.3d at 1253 (only requiring substantial compliance with Rule 30(b) in reviewing a district court's supplemental jury instructions); *Descent,* 292 F.3d at 707 (only requiring substantial compliance with Rule 30(b) in reviewing a district court's alteration of the jury instructions to match the amount eligible for forfeiture); *United States v. Clark,* 732 F.2d 1536, 1541 (11th. Cir. 1984) (only requiring substantial compliance with Rule 30(b) in reviewing a district court's linguistic conflation of two drug names). Nothing about Beaufils's case warrants departure from accepting substantial compliance with Rule 30(b).

statement, thus alleviating any potential prejudice arising out of those remarks. Specifically, it began charging the jury by establishing "it is [the court's] duty to instruct you on the rules of law that you must follow and apply in deciding this case," and that the jury "must follow the law as [the court] explains." Further, it instructed the jury to "consider only the evidence . . . admitted in this case," and it reminded them that "nothing the lawyers say is evidence in this case" and that "[w]hat the lawyers say is not binding on you." These instructions addressed any potential concern that the jury relied on the government's statement regarding deliberate ignorance as the law governing the case.

Moreover, the instructions emphasized that Beaufils's convictions had to be based on a finding of actual knowledge. *See United States v. Stone*, 9 F.3d 934, 937–42 (11th Cir. 1993); *see also United States v. Phelps*, 733 F.2d 1464, 1473 (11th Cir. 1984) ("The law presumes that the jury will follow the court's instructions, . . . and nothing of record supports the assertion that the jury was confused or unable to follow the limiting instruction of the court."); *Shriner v. Wainwright*, 715 F.2d 1452, 1459 (11th Cir. 1983) ("[W]ith a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks."). Deliberate ignorance is simply one way the knowledge element of a criminal violation can be proven—another being actual knowledge. *See United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000). Deliberate ignorance refers to when a defendant intentionally avoids discovering the truth, and it is an insufficient basis to claim the defendant lacked a "knowing" element of a crime. *United States v. Stone*, 9 F.3d 934, 936-37

(11th Cir. 1993).  Therefore, the absence of the instruction arguably actually harmed the government by eliminating another potential avenue for proving there was no way Beaufils could not have known the nature and extent of the fraudulent scheme which served as the basis for her conviction.  Thus, the jury instruction did not prejudice Beaufils.  *Beasley*, 72 F.3d at 1529 n.9.

Finally, although the government's remarks on deliberate ignorance were far from comprehensive, they did not misstate the law or improperly shift the government's burden onto Beaufils; so, she was not prejudiced.  The government referred to deliberate ignorance as the "ostrich defense," a common phrase courts across the country use,[4] and briefly recounted evidence that undermined Beaufils's arguments that she lacked knowledge regarding the overall fraudulent scheme.  Again, the district court's jury instructions sufficiently explained the particular elements of the charged crimes and reiterated the government's burden of proof.  When describing wire fraud, the court stated that the government must prove "beyond a reasonable doubt" that "the defendant knowingly devised or participated in a scheme to defraud someone by using false or fraudulent pretenses, representations or promises."  As to health care fraud, the court explained that the prosecution must prove "beyond a reasonable doubt" that "the defendant knowingly executed or attempted [] to execute a scheme or artifice to

---

[4] *See, e.g.*, *United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir. 1991); *Bos. & Maine Corp. v. Massachusetts Bay Transp. Auth.*, 587 F.3d 89, 101 (1st Cir. 2009); *United States v. Williams*, 202 F.3d 959, 962–63 (7th Cir. 2000).

defraud . . . ."  The court also stated that "[w]hat must be proven beyond a reasonable doubt is that the defendant knowingly attempted or carried out a scheme substantially similar to the one alleged in the indictment."  In sum, reviewing the record as a whole, the district court's failure to inform the parties of its intended ruling followed by not giving the requested jury instruction, while plain error, did not affect Beaufils's substantial rights.

### C.  Two-Level Sentencing Enhancement for Obstruction

Beaufils argues the district court clearly erred by imposing a two-level enhancement under § 3C1.1 for obstruction of justice. The Sentencing Guidelines provide for a two-level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction."  U.S.S.G. § 3C1.1.

A defendant may obstruct or impede justice by committing perjury.  *Id.* cmt. n.4(b).  For a district court to find a defendant perjured herself, the testimony must be: (1) made under oath or affirmation; (2) false; (3) material; and (4) "given with the willful intent to provide false testimony and not as a result of a mistake, confusion, or faulty memory."  *Singh,* 291 F.3d at 763 n.4; *see United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  Testimony is "material" under Section 3C1.1 where, if considered truthful, it would be prone to influence or affect the issue to be decided.  U.S.S.G. § 3C1.1, cmt. n.6.  Ordinarily, making a false statement to law enforcement officers without being under oath does not constitute

perjury under Section 3C1.1 *unless* that materially false statement "significantly obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1 cmt. nn.5(B) & 4(G).

Typically, if a district court applies this enhancement based on perjury, it should "make specific findings as to each alleged instance of obstruction by identifying the materially false statements individually." *Singh*, 291 F.3d at 763 (citing *United States v. Arguedas*, 86 F.3d 1054, 1059 (11th Cir. 1996)). However, a district court may make a general finding that the enhancement is warranted if its determination includes "all of the factual predicates necessary for a perjury finding." *Id.* (quoting *United States v. Lewis*, 115 F.3d 1531, 1538 (11th Cir. 1997)).

The district court found Beaufils perjured herself when "she made a specific and wholesale denial of the actual criminal acts, and this was . . . incrementally modified, altered or withdrawn as the case may be when on cross examination she was confronted by prior inconsistencies." The court noted "her sometimes enthusiastic denials and her attempt to reconcile the facts seemingly proven by the evidence at trial with prior inconsistencies."

Nevertheless, Beaufils maintains the only other "proof" of perjury pertained to her voluntary interview with Agent Dye early in the investigation, during which she was not under oath and during which she never signed an affidavit swearing to the truthfulness of her statements. Further, she contends that her testimony at trial did not conflict with what she told Agent Dye, and that any

inconsistency between her trial testimony and her FBI interview simply does not rise to the level of perjury.  However, Beaufils's testimony stating that she thought the charts that she was reviewing were being prepared by, and then reviewed by, other physicians was rebutted by Frame's testimony that (1) neither Frame nor any of her employees told Beaufils that the files she was reviewing were first being completed by other providers, and (2) the patient forms provided to Beaufils were incomplete and only contained her signature, not that of any other medical professional.  Furthermore, she told Agent Dye that she had called patients and had performed examinations, but then testified at trial that she did neither of these things.

Generally, "[w]e do not second-guess the district court's credibility determination," especially when bolstered by the jury's verdict.  *Singer*, 963 F.3d at 1166.  Here, the district court stated that, although its credibility findings were not solely based on the jury's verdict, the verdict did support an inference that the jury agreed as to the credibility determination.  This analysis comports with our precedent, which has upheld an obstruction-of-justice enhancement where the court, independent from but in agreement with the jury's verdict, found a convicted defendant's material testimony to lack credibility.  *See Singer*, 963 F.3d at 1165–66.  Because the district court did not clearly err in its analysis of the facts underlying its perjury determination, we affirm the district court's application of the two-level sentencing enhancement for obstruction of justice.

### D. Motion for New Trial

Finally, Beaufils argues that the district court should have accepted her untimely motion for a new trial because she established excusable neglect. She states that her trial attorney rejected her original request to file the motion and failed to instruct her on how to pursue such relief, and that her new appellate counsel, whom she hired after the filing deadline, eventually honored her request.

A defendant must file a motion for a new trial, on grounds other than newly discovered evidence, within 14 days after a verdict is returned. FED. R. CRIM. P. 33(b)(2). However, a district court may extend this deadline after it has already expired "if the party failed to act because of excusable neglect." FED. R. CRIM. P. 45(b)(1)(B).

Although we have not definitively interpreted the phrase "excusable neglect" in the context of Federal Rule of Criminal Procedure 45, we have used consistent interpretations of the phrase in the context of other federal rules. For example, the Court adopted the same interpretation of "excusable neglect" in the context of both Federal Rule of Civil Procedure 60(b) and Federal Rule of Appellate Procedure 4(a)(5). *See Cheney v. Anchor Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996) (adopting the interpretation for Federal Rule of Civil Procedure 60(b)); *see also Advanced Estimating Sys., Inc. v. Riney*, 77 F.3d 1322, 1324 (11th Cir. 1996) (adopting the interpretation for Federal Rule of Appellate Procedure 4(a)(5)). In the cases adopting that interpretation, we held that a court

44                    Opinion of the Court                    22-13292

analyzing a claim of excusable neglect must make an equitable decision when considering whether or not to excuse a party's negligence in failing to meet a deadline, taking into account all relevant circumstances as to what led to that party's failure. *See Cheney*, 71 F.3d at 850; *Riney*, 77 F.3d at 1325. We listed the following as pertinent factors to guide a court's analysis: "the danger of prejudice to the nonmovant, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Riney*, 77 F.3d at 1325 (alteration accepted) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)); *see Cheney*, 71 F.3d at 850 (quoting *Pioneer Inv. Servs. Co.*, 507 U.S. at 395).[5]

In *Riney*, we held that there was no reason why the meaning and analysis of "excusable neglect" would be different in Bankruptcy Rule 9006(b)(1), Federal Rule of Civil Procedure 60(b), and Federal Rule of Appellate Procedure 4(a)(5), and we applied a consistent analysis across all three rules. 77 F.3d at 1324. Similarly, we see no reason why our prior excusable neglect framework should not also be applied to Federal Rule of Criminal Procedure 45(b)(1)(B), and we apply it here.

---

[5] Our two cases mentioned here, *Cheney* and *Riney*, viewed the Supreme Court's decision in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, a case interpreting "excusable neglect" in Bankruptcy Rule 9006(b)(1), as instructive.

When considering the third *Pioneer* factor, whether the reason for the delay was within the movant's reasonable control, we have specifically held that "[c]ounsel's misunderstanding of the law" does not qualify as "reason for delay" amounting to excusable neglect under Rule 45. *United States v. Snipes*, 611 F.3d 855, 865 (11th Cir. 2010) (quoting *Corwin v. Walt Disney Co., 475* F.3d 1239, 1255 (11th Cir. 2007)). Although typically we have applied this rule in cases where counsel misunderstood the filing deadlines and requirements, we have held that an attorney's failure to understand or review clear law cannot, as a categorical matter, constitute excusable neglect to relieve a party from the consequences of failing to comply with a statutory deadline. *United States v. Davenport*, 668 F.3d 1316, 1324 (11th Cir. 2012).

Here, under *Pioneer's* definition of "neglect," Beaufils's trial counsel's failure to move for a new trial was neither a simple nor careless *omission*, but rather an active *decision* based on their view that there were no legitimate grounds to do so. *See Pioneer*, 507 U.S. at 388. For this reason alone, the district court did not abuse its discretion in holding that trial counsel's intentional decision did not constitute excusable neglect.

Even if the record did not belie Beaufils's contention that her attorney's purported misunderstanding of the law caused the untimely filing of her motion, Beaufils's argument loses because an attorney's mistake of law generally cannot constitute excusable neglect. *Davenport*, 668 F.3d at 1324. As the district court did not misapply the law or make findings of fact that were clearly

erroneous, it did not abuse its discretion in dismissing Beaufils's motion as untimely. Therefore, we affirm Beaufils's convictions on this ground. *Scrushy*, 721 F.3d at 1303.

## IV.    CONCLUSION

For the foregoing reasons, we affirm Beaufils's convictions and sentence.

**AFFIRMED.**